No. 24-1727

*In the*

# United States Court of Appeals

*for the*

# Fourth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, NETCHOICE, and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiffs-Appellants,*

– v. –

BROOKE E. LIERMAN,

*Defendant-Appellee.*

On appeal from a final judgment of the
United States District Court for the District of Maryland
Case No. 21-cv-410, Hon. Lydia Kay Griggsby

**JOINT APPENDIX**

RYAN R. DIETRICH
  *Assistant Attorney General*
  *Office of the Attorney General*
  *200 Saint Paul Place, 20th Floor*
  *Baltimore, Maryland 21202*
  *(410) 576-7648*

*Counsel for Appellee*

MICHAEL B. KIMBERLY
SARAH P. HOGARTH
CHARLES SEIDELL
  *McDermott Will & Emery LLP*
  *500 N. Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for all Appellants*

TARA S. MORRISSEY
JENNIFER B. DICKEY
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

*Counsel for the Chamber of
Commerce of the United States of
America*

# TABLE OF CONTENTS

Civil Docket, *Chamber of Commerce v. Lierman*, District of Maryland (Baltimore) No. 1:21-cv-00410-LKG ...................................................JA001

Amended Complaint for Injunctive and Declaratory Relief (Apr. 30, 2021) ........................................................................................JA015

Senate Bill 787 .................................................................... JA037

Joint Status Report (Apr. 4, 2022)..................................... JA045

Defendant's Supplemental Brief Regarding the Interpretation of the Pass-Through Provision (Mar. 29, 2024) ........................................... JA049

Plaintiffs' Supplemental Opening Brief on the Meaning of the Pass-Through Provision (Mar. 29, 2024) ................................................... JA054

Defendant's Supplemental Response Brief Regarding the Interpretation of the Pass-Through Provision (Apr. 8, 2024).............. JA063

Plaintiffs' Supplemental Response Brief on the Meaning of the Pass-Through Provision (Apr. 8, 2024)....................................................... JA065

Memorandum Opinion (July 3, 2024)................................. JA068

Notice of Appeal (Aug. 2, 2024) ........................................ JA088

Final Judgment (Aug. 8, 2024)........................................... JA090

Amended Notice of Appeal (Aug. 13, 2024) ........................................JA091

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00410-LKG

Chamber of Commerce of the United States of America et al v. Lierman

Assigned to: Judge Lydia Kay Griggsby

Demand: $0

Case in other court:  USCA, 22-02275
                      USCA, 24-01727

Cause: 42:1983 Civil Rights Act - Civil Action for Deprivation of Rights

Date Filed: 02/18/2021

Date Terminated: 08/08/2024

Jury Demand: None

Nature of Suit: 950 Constitutional - State Statute

Jurisdiction: Federal Question

## Plaintiff

**Chamber of Commerce of the United States of America**

represented by   **Michael B. Kimberly**
McDermott Will & Emery
500 North Capitol Street, NW
The McDermott Building
Washington, DC 20001
202-756-8901
Email: mkimberly@mwe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Dickey**
U.S. Chamber Litigation Center
1615 H St. NW
Washington, DC 20062
2024635337
Email: jdickey@uschamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul Whitfield Hughes , III**
McDermott Will & Emery
500 North Capitol Street, NW
The McDermott Building
Washington, DC 20001
(202) 756-8981
Email: phughes@mwe.com
*ATTORNEY TO BE NOTICED*

**Sarah Hogarth**
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
202-756-8354

JA001

Fax: 202-756-8087
Email: shogarth@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen P. Kranz**
McDermott Will and Emery LLP
500 N. Capitol St. NW
Washington, DC 20001
2027568180
Fax: 2025912859
Email: skranz@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tara Morrissey**
U.S. Chamber Litigation Center
1615 H St. NW
Washington, DC 20062
2024635668
Email: tmorrissey@uschamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Internet Association**                  represented by   **Michael B. Kimberly**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Paul Whitfield Hughes , III**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Sarah Hogarth**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Stephen P. Kranz**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**NetChoice**                             represented by   **Michael B. Kimberly**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Paul Whitfield Hughes , III**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Sarah Hogarth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen P. Kranz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Computer & Communications Industry Association** | represented by | **Michael B. Kimberly**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Paul Whitfield Hughes , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hogarth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen P. Kranz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Brooke Lierman** | represented by | **Julia Doyle**<br>Maryland Office of the Attorney General<br>Civil Litigation Division<br>200 Saint Paul Pl 20th Fl<br>Baltimore, MD 21202<br>14105767291<br>Fax: 14105766955<br>Email: jdoyle@oag.state.md.us<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Steven M Sullivan**
State of Maryland Office of the Attorney
General
200 Saint Paul Place
Baltimore, MD 21202
14105766325
Fax: 14105766955
Email: ssullivan@oag.state.md.us
*LEAD ATTORNEY*

JA003

*ATTORNEY TO BE NOTICED*

**Brian Lee Oliner**
Maryland Office of the Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, MD 21404-0591
410-260-7808
Fax: 410-974-5895
Email: boliner@oag.state.md.us
*TERMINATED: 11/10/2022*

**Ryan Robert Dietrich**
Office of the Attorney General- State of
Maryland
200 St. Paul Place
Baltimore, MD 21202
410-576-7648
Email: rdietrich@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Amicus**

**Young Ran (Christine) Kim**          represented by  **Aman Tewari George**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
2027011783
Email: ageorge@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samara M Spence**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
2024489090
Email: sspence@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Andrew Thronson**
Wais, Vogelstein, Forman, Koch & Norman
1829 Reisterstown Road
Suite 425
Baltimore, MD 21208
410-998-3600
Email: pthronson@jjsjustice.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Darien Shanske**          represented by  **Aman Tewari George**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samara M Spence**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Andrew Thronson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/18/2021 | 1 | COMPLAINT against Peter Franchot, in his official capacity as Comptroller of the State of Maryland ( Filing fee $ 402 receipt number 0416-9117611.), filed by Chamber of Commerce of the United States of America, Internet Association, Computer & Communications Industry Association, NetChoice. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 2 | Summons Issued 21 days as to Peter Franchot.(ybs, Deputy Clerk) (Entered: 02/18/2021) |
| 02/18/2021 | 3 | NOTICE of Appearance by Michael B. Kimberly on behalf of Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice (Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 4 | NOTICE of Appearance by Paul Whitfield Hughes on behalf of Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice (Hughes, Paul) (Entered: 02/18/2021) |
| 02/18/2021 | 5 | Local Rule 103.3 Disclosure Statement by Chamber of Commerce of the United States of America (Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 6 | Local Rule 103.3 Disclosure Statement by Internet Association (Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 7 | Local Rule 103.3 Disclosure Statement by NetChoice (Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 8 | Local Rule 103.3 Disclosure Statement by Computer & Communications Industry Association (Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 9 | MOTION to Appear Pro Hac Vice for Stephen P. Kranz (Filing fee $100, receipt number 0416-9118011.) by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice(Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 10 | MOTION to Appear Pro Hac Vice for Sarah P. Hogarth (Filing fee $100, receipt number 0416-9118052.) by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice(Kimberly, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | 11 | MOTION to Appear Pro Hac Vice for Tara S. Morrissey (Filing fee $100, receipt number 0416-9118079.) by Chamber of Commerce of the United States of America (Kimberly, Michael) Modified on 2/19/2021 (kns, Deputy Clerk). (Entered: 02/18/2021) |
| 02/18/2021 | 12 | MOTION to Appear Pro Hac Vice for Jennifer B. Dickey (Filing fee $100, receipt number 0416-9118122.) by Chamber of Commerce of the United States of America(Kimberly, Michael) (Entered: 02/18/2021) |

JA005

| | | |
|---|---|---|
| 02/19/2021 | 13 | PAPERLESS ORDER granting 9 Motion to Appear Pro Hac Vice on behalf of Stephen P. Kranz. Directing attorney Stephen P. Kranz to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 2/19/2021. (srd, Deputy Clerk) (Entered: 02/19/2021) |
| 02/19/2021 | 14 | PAPERLESS ORDER granting 10 Motion to Appear Pro Hac Vice on behalf of Sarah P Hogarth. Directing attorney Sarah P Hogarth to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 2/19/2021. (srd, Deputy Clerk) (Entered: 02/19/2021) |
| 02/19/2021 | 15 | PAPERLESS ORDER granting 11 Motion to Appear Pro Hac Vice on behalf of Tara Morrissey. Directing attorney Tara Morrissey to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 2/19/2021. (srd, Deputy Clerk) (Entered: 02/19/2021) |
| 02/19/2021 | 16 | PAPERLESS ORDER granting 12 Motion to Appear Pro Hac Vice on behalf of Jennifer B Dickey. Directing attorney Jennifer B Dickey to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 2/19/2021. (srd, Deputy Clerk) (Entered: 02/19/2021) |
| 02/24/2021 | 17 | SUMMONS Returned Executed by Chamber of Commerce of the United States of America, Internet Association, Computer & Communications Industry Association, NetChoice. Peter Franchot served on 2/24/2021, answer due 3/17/2021.(Kimberly, Michael) (Entered: 02/24/2021) |
| 03/05/2021 | 18 | NOTICE of Appearance by Steven M Sullivan on behalf of Peter Franchot (Sullivan, Steven) (Entered: 03/05/2021) |
| 03/05/2021 | 19 | Consent MOTION for Extension of Time to File Response/Reply as to 1 Complaint, by Peter Franchot. (Attachments: # 1 Text of Proposed Order)(Sullivan, Steven) (Entered: 03/05/2021) |
| 03/05/2021 | 20 | PAPERLESS ORDER GRANTING 19 consent motion for extension of time. Defendant's response to Plaintiffs' complaint is now due by April 16, 2021. Signed by Judge Deborah K. Chasanow on 3/5/2021. (Chasanow, Deborah) (Entered: 03/05/2021) |
| 04/14/2021 | 21 | Consent MOTION for Extension of Time to File Response/Reply as to 1 Complaint, *and for Leave to File Joint Status Report* by Peter Franchot. (Attachments: # 1 Text of Proposed Order)(Sullivan, Steven) (Entered: 04/14/2021) |
| 04/14/2021 | 22 | PAPERLESS ORDER GRANTING 21 consent motion for extension of time and DIRECTING the parties to file a joint status report with a proposed schedule on or before April 30, 2021. Signed by Judge Deborah K. Chasanow on 4/14/2021. (Chasanow, Deborah) (Entered: 04/14/2021) |
| 04/30/2021 | 23 | NOTICE Communications Industry Association, Internet Association, NetChoice *of filing of amended complaint* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Kimberly, Michael) Modified on 4/30/2021 (ybs, Deputy Clerk). (Entered: 04/30/2021) |
| 04/30/2021 | 24 | STATUS REPORT *with Proposed Schedule Jointly Submitted by the Parties* by Peter Franchot (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order) (Sullivan, Steven) (Entered: 04/30/2021) |
| 04/30/2021 | 25 | AMENDED COMPLAINT against Peter Franchot, filed by Chamber of Commerce of the United States of America, Internet Association, Computer & Communications Industry Association, NetChoice. (Attachments: # 1 Redline Version)(ybs, Deputy Clerk) (Entered: 04/30/2021) |

JA006

| | | |
|---|---|---|
| 04/30/2021 | 26 | PAPERLESS ORDER THANKING counsel for 24 joint status report and APPROVING the parties' proposed schedule. Defendant's dispositive motion in response 25 amended complaint is due by June 15, Plaintiffs' combined opposition and cross-motion for summary judgment is due by July 29, Defendant's combined reply and opposition is due by September 13, and Plaintiffs' reply is due by October 13, 2021. Signed by Judge Deborah K. Chasanow on 4/30/2021. (Chasanow, Deborah) (Entered: 04/30/2021) |
| 06/10/2021 | 27 | Consent MOTION for Leave to File Excess Pages by Peter Franchot (Attachments: # 1 Text of Proposed Order)(Sullivan, Steven) (Entered: 06/10/2021) |
| 06/10/2021 | 28 | PAPERLESS ORDER GRANTING 27 consent motion to extend page limitation. Defendant's anticipated dispositive motion due June 15 is limited to 50 pages. Signed by Judge Deborah K. Chasanow on 6/10/2021. (Chasanow, Deborah) (Entered: 06/10/2021) |
| 06/15/2021 | 29 | MOTION to Dismiss *Amended Complaint* by Peter Franchot (Attachments: # 1 Memorandum in Support with Appendix, # 2 Text of Proposed Order)(Sullivan, Steven) (Entered: 06/15/2021) |
| 06/15/2021 | 30 | NOTICE of Appearance by Julia Doyle Bernhardt on behalf of All Defendants (Bernhardt, Julia) (Entered: 06/15/2021) |
| 07/29/2021 | 31 | Cross MOTION for Summary Judgment by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice (Attachments: # 1 Brief, # 2 Text of Proposed Order)(Kimberly, Michael) Modified on 8/2/2021 (ybs, Deputy Clerk). (Entered: 07/29/2021) |
| 07/30/2021 | 32 | PAPERLESS NOTICE: Plaintiffs' memorandum supporting their cross-motion for summary judgment filed at ECF No. 31-1 is longer than the rules allow and longer than the 50 page limit granted to Defendant. Counsel are reminded of the page limitations and are urged to abide by them. (sat, Chambers) (Entered: 07/30/2021) |
| 07/30/2021 | 33 | Correspondence re: page limits (Kimberly, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 34 | Joint MOTION for Leave to File Excess Pages *for cross-motions briefing* by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice(Kimberly, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 35 | PAPERLESS ORDER GRANTING 34 joint motion to set page limits. Plaintiffs' 61-page memorandum supporting their combined opposition to Defendant's motion to dismiss and cross-motion for summary judgment is accepted, Defendant may have 40 pages to file its consolidated reply to its motion to dismiss and opposition to Plaintiff's cross-motion for summary judgment, and Plaintiffs may have 20 pages for their reply to their cross-motion for summary judgment. Signed by Judge Deborah K. Chasanow on 7/30/2021. (Chasanow, Deborah) (Entered: 07/30/2021) |
| 09/13/2021 | 36 | REPLY to Response to Motion re 29 MOTION to Dismiss *Amended Complaint*, 31 Cross MOTION for Summary Judgment filed by Peter Franchot. (Attachments: # 1 Exhibit 1 Affidavit of Andrew Maschas, # 2 Exhibit 2 Affidavit of John T. Hearn, # 3 Exhibit 3 Affidavit of Brian Oliner, # 4 Exhibit 4 Text of Senate Bill 787)(Sullivan, Steven) (Entered: 09/13/2021) |
| 09/20/2021 | 37 | MOTION for Leave to File *Brief of Amici Curiae Tax Law Professors in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* by Young Ran (Christine) Kim, Darien Shanske (Attachments: # 1 Exhibit A - CV of Prof. Shanske, # 2 Exhibit B - CV of Prof. Kim, # 3 Brief of Amici Curiae Tax Law Professors Shanske and Kim, # 4 Text of Proposed Order)(Thronson, Patrick) (Entered: 09/20/2021) |

JA007

| 09/20/2021 | 38 | MOTION to Appear Pro Hac Vice for Aman Tewari George (Filing fee $100, receipt number 0416-9503774.) by Young Ran (Christine) Kim, Darien Shanske(Thronson, Patrick) (Entered: 09/20/2021) |
|---|---|---|
| 09/20/2021 | 39 | MOTION to Appear Pro Hac Vice for Samara M. Spence (Filing fee $100, receipt number 0416-9503779.) by Young Ran (Christine) Kim, Darien Shanske(Thronson, Patrick) (Entered: 09/20/2021) |
| 09/22/2021 | 40 | QC NOTICE: 38 Motion to Appear Pro Hac Vice filed by Young Ran (Christine) Kim, Darien Shanske needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (dm4, Deputy Clerk) (Entered: 09/22/2021) |
| 09/22/2021 | 41 | QC NOTICE: 39 Motion to Appear Pro Hac Vice filed by Young Ran (Christine) Kim, Darien Shanske needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (dm4, Deputy Clerk) (Entered: 09/22/2021) |
| 09/23/2021 | 42 | CORRECTED MOTION to Appear Pro Hac Vice for Samara M. Spence by Young Ran (Christine) Kim, Darien Shanske. The fee has already been paid.(Thronson, Patrick) (Entered: 09/23/2021) |
| 09/23/2021 | 43 | CORRECTED MOTION to Appear Pro Hac Vice for Aman Tewari George by Young Ran (Christine) Kim, Darien Shanske. The fee has already been paid.(Thronson, Patrick) (Entered: 09/23/2021) |
| 09/27/2021 | 44 | PAPERLESS ORDER granting 42 Corrected Motion to Appear Pro Hac Vice on behalf of Samara M Spence. Directing attorney Samara M Spence to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 9/27/2021. (dm4, Deputy Clerk) (Entered: 09/27/2021) |
| 09/27/2021 | 45 | PAPERLESS ORDER granting 43 Corrected Motion to Appear Pro Hac Vice on behalf of Aman George. Directing attorney Aman George to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 9/27/2021. (dm4, Deputy Clerk) (Entered: 09/27/2021) |
| 10/04/2021 | 46 | LETTER/ORDER directing Plaintiffs to submit updated disclosures by October 18, 2021. Signed by Judge Deborah K. Chasanow on 10/4/2021. (sat, Chambers) (Entered: 10/04/2021) |
| 10/13/2021 | 47 | RESPONSE re 36 Reply to Response to Motion, 31 Cross MOTION for Summary Judgment , REPLY to Response to Motion filed by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice.(Kimberly, Michael) (Entered: 10/13/2021) |
| 10/15/2021 | 48 | Correspondence re: order of October 4, 2021 (Kimberly, Michael) (Entered: 10/15/2021) |
| 10/19/2021 | 49 | NOTICE re: recusal. (sat, Chambers) (Entered: 10/19/2021) |
| 10/20/2021 | | Case Reassigned to Judge Lydia Kay Griggsby. Judge Deborah K. Chasanow no longer assigned to the case. (jf3s, Deputy Clerk) (Entered: 10/20/2021) |
| 10/22/2021 | 50 | ORDER Scheduling Telephone Status Conference for Wednesday, October 27, 2021, at 3:30 p.m. Eastern Time. Signed by Judge Lydia Kay Griggsby on 10/22/2021. (bas, Deputy Clerk) (Entered: 10/22/2021) |
| 10/25/2021 | 51 | NOTICE of Appearance by Brian Lee Oliner on behalf of All Defendants (Oliner, Brian) (Entered: 10/25/2021) |

JA008

| | | |
|---|---|---|
| 10/25/2021 | 52 | CASE MANAGEMENT ORDER. Signed by Judge Lydia Kay Griggsby on 10/25/2021. (bas, Deputy Clerk) (Entered: 10/25/2021) |
| 10/26/2021 | 53 | Consent MOTION for Other Relief *Appear Without Presence of Local Counsel* by Young Ran (Christine) Kim, Darien Shanske (Attachments: # 1 Text of Proposed Order) (Thronson, Patrick) (Entered: 10/26/2021) |
| 10/27/2021 | 55 | Telephone Conference held on 10/27/2021 before Judge Lydia Kay Griggsby. (rc2s, Deputy Clerk) (Entered: 11/02/2021) |
| 10/28/2021 | 54 | SCHEDULING ORDER and ORDER granting 37 Motion for Leave to File; denying-as-moot 53 Motion for Other Relief. The State's supplemental brief due by 11/19/2021. Plaintiffs' responsive supplemental brief due by 12/13/2021. Signed by Judge Lydia Kay Griggsby on 10/28/2021. (rs7s, Chambers) (Entered: 10/28/2021) |
| 11/19/2021 | 56 | Supplemental to 36 Reply to Response to Motion, 29 MOTION to Dismiss *Amended Complaint* filed by Peter Franchot *Supplemental Brief on Tax Injunction Act Applicability* (Attachments: # 1 Exhibit Exhibit 5 Affidavit of Brian Oliner)(Sullivan, Steven) (Entered: 11/19/2021) |
| 12/13/2021 | 57 | Memorandum re 29 MOTION to Dismiss *Amended Complaint*, 31 Cross MOTION for Summary Judgment *court-ordered supplemental brief* filed by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice.(Kimberly, Michael) (Entered: 12/13/2021) |
| 01/04/2022 | 58 | ORDER Scheduling Oral Argument on Thursday, February 17, 2022 at 2:00 p.m.. Signed by Judge Lydia Kay Griggsby on 1/4/2022. (bas, Deputy Clerk) (Entered: 01/04/2022) |
| 02/02/2022 | 59 | MOTION for Other Relief *Postponement of Feb. 17, 2022 Hearing* by Peter Franchot (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1 Motion to Promulgate, # 3 Exhibit 2 Maryland Court of Appeals Order Jan. 28, 2022)(Sullivan, Steven) (Entered: 02/02/2022) |
| 02/02/2022 | 60 | RESPONSE in Opposition re 59 MOTION for Other Relief *Postponement of Feb. 17, 2022 Hearing* filed by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice.(Kimberly, Michael) (Entered: 02/02/2022) |
| 02/02/2022 | 61 | REPLY to Response to Motion re 59 MOTION for Other Relief *Postponement of Feb. 17, 2022 Hearing* filed by Peter Franchot.(Sullivan, Steven) (Entered: 02/02/2022) |
| 02/03/2022 | 62 | ORDER denying 59 Motion for Postponement of the Feb. 17, 2022 Hearing. Signed by Judge Lydia Kay Griggsby on 2/3/2022. (rs7s, Chambers) (Entered: 02/03/2022) |
| 02/04/2022 | 63 | ORDER re: February 17, 2022 Oral Argument. Signed by Judge Lydia Kay Griggsby on 2/4/2022. (rs7s, Chambers) (Entered: 02/04/2022) |
| 02/17/2022 | 64 | Motion Hearing held on 2/17/2022 re 29 MOTION to Dismiss *Amended Complaint* filed by Peter Franchot, 31 Cross MOTION for Summary Judgment filed by Computer & Communications Industry Association, NetChoice, Internet Association, Chamber of Commerce of the United States of America before Judge Lydia Kay Griggsby.(Court Reporter: Melissa Clark) (dg4s, Deputy Clerk) (Entered: 02/17/2022) |
| 03/03/2022 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 02/17/2022, before Judge Lydia K. Griggsby. Court Reporter/Transcriber Melissa L. Clark, Telephone number 410-962-4474. Total number of pages filed: 81. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/24/2022. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 4/4/2022. Release of Transcript Restriction set for 6/1/2022. (Melissa L. Clark, Court Reporter) (Entered: 03/03/2022) |
| 03/04/2022 | 66 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 29 Motion to Dismiss. Joint status report due by 4/4/2022. Signed by Judge Lydia Kay Griggsby on 3/4/2022. (rs7s, Chambers) (Entered: 03/04/2022) |
| 03/31/2022 | 67 | REVISED MEMORANDUM OPINION AND ORDER granting in part and denying in part 29 Motion to Dismiss; denying-as-moot 31 Cross-motion for Summary Judgment. Joint status report due by 4/4/2022.. Signed by Judge Lydia Kay Griggsby on 3/30/2022. (kb3s, Deputy Clerk) (Entered: 03/31/2022) |
| 04/04/2022 | 68 | Status Report Submitted by Peter Franchot (Oliner, Brian) (Entered: 04/04/2022) |
| 04/08/2022 | 69 | ORDER re 68 Status Report Submitted filed by Peter Franchot. Supplemental briefs due by 4/29/2022. Responsive supplemental briefs due by 5/13/2022. Signed by Judge Lydia Kay Griggsby on 4/8/2022. (rs7s, Chambers) (Entered: 04/08/2022) |
| 04/29/2022 | 70 | Supplemental to *motion for summary judgment* (Kimberly, Michael) (Entered: 04/29/2022) |
| 04/29/2022 | 71 | Supplemental to 36 Reply to Response to Motion, filed by Peter Franchot *Supplemental Brief supporting dismissal of First Amendment claim* (Sullivan, Steven) (Entered: 04/29/2022) |
| 05/13/2022 | 72 | RESPONSE in Support re 29 MOTION to Dismiss *Amended Complaint Responsive Supplemental Brief* filed by Peter Franchot.(Sullivan, Steven) (Entered: 05/13/2022) |
| 05/13/2022 | 73 | Supplement to *motion for summary judgment* (Kimberly, Michael) (Entered: 05/13/2022) |
| 05/23/2022 | 74 | ORDER Scheduling Hearing on Oral Argument. Signed by Judge Lydia Kay Griggsby on 5/23/2022. (mg4s, Chambers) (Entered: 05/23/2022) |
| 07/05/2022 | 75 | ORDER re: July 12, 2022 Oral Argument. Signed by Judge Lydia Kay Griggsby on 7/5/2022. (mg4s, Chambers) (Entered: 07/05/2022) |
| 07/12/2022 | 76 | NOTICE by Peter Franchot *of Supplemental Authority* (Attachments: # 1 Attachment Court Decision, # 2 Attachment Court Decision, # 3 Attachment Court Decision) (Sullivan, Steven) (Entered: 07/12/2022) |
| 07/12/2022 | 77 | Oral Argument Hearing held on 7/12/2022 before Judge Lydia Kay Griggsby (R. Carrick - Courtroom 5A (virtual)).(Court Reporter: Melissa Clark) (rc2s, Deputy Clerk) (Entered: 07/12/2022) |
| 07/13/2022 | 78 | SCHEDULING ORDER. Joint status report due by 7/22/2022. Signed by Judge Lydia Kay Griggsby on 7/13/2022. (rs7s, Chambers) (Entered: 07/13/2022) |
| 07/22/2022 | 79 | STATUS REPORT by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice(Kimberly, Michael) (Entered: 07/22/2022) |
| 07/25/2022 | 80 | SCHEDULING ORDER. Opening supplemental briefs due by 8/12/2022. Responsive supplemental briefs due by 8/26/2022. Signed by Judge Lydia Kay Griggsby on 7/25/2022. (rs7s, Chambers) (Entered: 07/25/2022) |
| 08/12/2022 | 81 | Supplement to 36 Reply to Response to Motion, 56 Supplement, 72 Response in Support of Motion, 71 Supplement filed by Peter Franchot *Supplemental Brief Regarding Commercial Speech Analysis* (Sullivan, Steven) (Entered: 08/12/2022) |
| 08/12/2022 | 82 | Supplement to *motion for summary judgment* (Kimberly, Michael) (Entered: 08/12/2022) |

JA010

| | | |
|---|---|---|
| 08/20/2022 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 07/12/2022, before Judge Lydia K. Griggsby. Court Reporter/Transcriber Melissa L. Clark, Telephone number 717-414-1048. Total number of pages filed: 89. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 9/12/2022. Redacted Transcript Deadline set for 9/20/2022. Release of Transcript Restriction set for 11/18/2022.(Clark, Melissa) (Entered: 08/20/2022) |
| 08/23/2022 | 84 | NOTICE by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice *Rule 25 Notice of Dissolution of Former Plaintiff Internet Association* (Kimberly, Michael) (Entered: 08/23/2022) |
| 08/26/2022 | 85 | Supplement to *motion for summary judgment re: Central Hudson* (Attachments: # 1 Exhibit A)(Kimberly, Michael) (Entered: 08/26/2022) |
| 08/26/2022 | 86 | RESPONSE re 82 Supplement *Defendant's Supplemental Responsive Brief Regarding Plaintiffs' Facial Challenge* filed by Peter Franchot.(Sullivan, Steven) (Entered: 08/26/2022) |
| 09/06/2022 | 87 | ORDER Scheduling Hearing on Oral Arguments. Signed by Judge Lydia Kay Griggsby on 9/6/2022. (mg4s, Chambers) (Entered: 09/06/2022) |
| 10/21/2022 | 88 | Correspondence re: state court decision (Kimberly, Michael) (Entered: 10/21/2022) |
| 10/24/2022 | 89 | ORDER Directing the Defendants to file a Status Report on or before October 31, 2022. Signed by Judge Lydia Kay Griggsby on 10/24/2022. (bas, Deputy Clerk) (Entered: 10/24/2022) |
| 10/24/2022 | 90 | CORRECTED ORDER Directing the Defendants to file a Status Report on or before October 31, 2022. Signed by Judge Lydia Kay Griggsby on 10/24/2022. (mg4s, Chambers) (Entered: 10/24/2022) |
| 10/31/2022 | 91 | STATUS REPORT by Peter Franchot(Sullivan, Steven) (Entered: 10/31/2022) |
| 11/10/2022 | 92 | MOTION to Withdraw as Attorney *Appearance of Brian L. Oliner* by Peter Franchot (Attachments: # 1 Text of Proposed Order)(Bernhardt, Julia) (Entered: 11/10/2022) |
| 11/10/2022 | 93 | PAPERLESS ORDER Granting 92 Defendants' Motion for Leave to Withdraw as Attorney. Attorney Brian Lee Oliner terminated. Signed by Judge Lydia Kay Griggsby on 11/10/2022. (mg4s, Chambers) (Entered: 11/10/2022) |
| 11/17/2022 | 94 | ORDER re: November 29, 2022 Oral Argument. Signed by Judge Lydia Kay Griggsby on 11/17/2022. (mg4s, Chambers) (Entered: 11/17/2022) |
| 11/25/2022 | 95 | STATUS REPORT *(Supplemental)* by Peter Franchot (Attachments: # 1 Attachment 1. First Amended Complaint, # 2 Attachment 2. Final Declaratory Judgment, # 3 Attachment 3. Order dismissing Counts 10 and 11, # 4 Attachment 4. Stipulation of Dismissal, # 5 Attachment 5. Notice of Appeal)(Sullivan, Steven) (Entered: 11/25/2022) |
| 11/29/2022 | 96 | Motion Hearing held on 11/29/2022 re 29 MOTION to Dismiss *Amended Complaint* filed by Peter Franchot, 31 Cross MOTION for Summary Judgment filed by Computer & Communications Industry Association, NetChoice, Internet Association, Chamber of Commerce of the United States of America before Judge Lydia Kay Griggsby.(Court Reporter: Trish Mitchell) (dg4s, Deputy Clerk) (Entered: 11/29/2022) |
| 12/02/2022 | 97 | Correspondence re: Legislative testimony referenced in Nov. 29, 2022 hearing (Attachments: # 1 Attachment 1. Maryland Chamber of Commerce testimony re SB 2, |

| | | |
|---|---|---|
| | | 2020 Session, # 2 Attachment 2. Howard County Chamber of Commerce testimony re SB 2, 2020 Session, # 3 Attachment 3. Interactive Advertising Bureau testimony re SB 2, 2020 Session, # 4 Attachment 4. American Advertising Federation testimony re SB 2, 2020 Session, # 5 Attachment 5. Maryland Tech Council testimony re SB 2, 2020 Session)(Sullivan, Steven) (Entered: 12/02/2022) |
| 12/02/2022 | 98 | MEMORANDUM AND ORDER DENYING AS MOOT 29 MOTION to Dismiss Amended Complaint; DENYING AS MOOT 31 Cross MOTION for Summary Judgment. Signed by Judge Lydia Kay Griggsby on 12/2/2022. (kb3s, Deputy Clerk) (Entered: 12/02/2022) |
| 12/07/2022 | 99 | Consent MOTION for Judgment *pursuant to Rule 58* by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, NetChoice (Attachments: # 1 Text of Proposed Order proposed judgment)(Kimberly, Michael) (Entered: 12/07/2022) |
| 12/08/2022 | 100 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 11/29/2022, before Judge Lydia Kay Griggsby. Court Reporter Patricia G. Mitchell, 410-962-3858, trish_mitchell@mdd.uscourts.gov. Total number of pages filed: 88. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/29/2022. Redacted Transcript Deadline set for 1/9/2023. Release of Transcript Restriction set for 3/8/2023. (pm, Court Reporter) (Entered: 12/08/2022) |
| 12/12/2022 | 101 | FINAL JUDGMENT. Signed by Clerk on 12/12/2022. (bas, Deputy Clerk) Modified on 3/5/2024 (bas, Deputy Clerk). (Entered: 12/12/2022) |
| 12/13/2022 | 102 | NOTICE OF APPEAL as to 101 Judgment by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, NetChoice. Filing fee $ 505, receipt number AMDDC-10322809.(Kimberly, Michael) (Entered: 12/13/2022) |
| 12/14/2022 | 103 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 102 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(kos, Deputy Clerk) (Entered: 12/14/2022) |
| 12/15/2022 | 104 | USCA Case Number 22-2275 for 102 Notice of Appeal filed by Computer & Communications Industry Association, NetChoice, Chamber of Commerce of the United States of America. Case Manager - Emily Borneisen (kos, Deputy Clerk) (Entered: 12/15/2022) |
| 07/18/2023 | 105 | ORDER of USCA "Granting" motion to withdraw Steven Marshall Sullivan from further representation on appeal as to 102 Notice of Appeal filed by Computer & Communications Industry Association, NetChoice, Chamber of Commerce of the United States of America. (slss, Deputy Clerk) (Entered: 07/18/2023) |
| 01/10/2024 | 106 | JUDGMENT of USCA (certified copy) Affirming in apart; Vacating in apart the Judgment of the District Court and Remanding to the District Court for further proceedings consistent with the Court's decisionas to 102 Notice of Appeal filed by Computer & Communications Industry Association, NetChoice, Chamber of Commerce of the United States of America. (Attachments: # 1 Opinion)(slss, Deputy Clerk) (Entered: 01/10/2024) |
| 02/01/2024 | 107 | MANDATE of USCA as to 102 Notice of Appeal filed by Computer & Communications Industry Association, NetChoice, Chamber of Commerce of the United States of America. (slss, Deputy Clerk) (Entered: 02/01/2024) |

JA012

| | | |
|---|---|---|
| 03/04/2024 | 108 | MOTION to Establish a Briefing Schedule by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice(Kimberly, Michael) (Entered: 03/04/2024) |
| 03/05/2024 | 109 | NOTICE of Appearance by Ryan Robert Dietrich on behalf of Peter Franchot (Dietrich, Ryan) (Entered: 03/05/2024) |
| 03/05/2024 | 110 | ORDER AMENDING JUDGMENT On March 31, 2022 (ECF No. 67 ), the Court dismissed Counts I, II, and III of the first amended complaint with prejudice for lack of jurisdiction. On December 2, 2022 (ECF No. 98 ), the Court dismissed the remaining claim (Count IV) of the first amended complaint without prejudice for lack of jurisdiction. Pursuant to the Courts orders dated March 31, 2022, and December 2, 2022, respectively, Counts I, II, and III of Plaintiffs' first amended complaint are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, and Count IV of Plaintiffs' first amended complaint is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction; Each party to bear its own costs. Signed by Judge Lydia Kay Griggsby on 3/5/2024. (bas, Deputy Clerk) Modified on 3/5/2024 (bas, Deputy Clerk). Modified on 3/5/2024 (bas, Deputy Clerk). (Entered: 03/05/2024) |
| 03/05/2024 | 111 | AMENDED FINAL JUDGMENT. Signed by Clerk on 3/5/2024. (bas, Deputy Clerk) (Entered: 03/05/2024) |
| 03/06/2024 | 112 | ORDER Scheduling a Telephonic Status Conference on Thursday, March 14, 2024 at 2:00 p.m. Eastern Time. Signed by Judge Lydia Kay Griggsby on 3/5/2024. (bas, Deputy Clerk) (Entered: 03/06/2024) |
| 03/14/2024 | 113 | Status Conference held on 3/14/2024 before Judge Lydia Kay Griggsby. (Court Reporter: FTR - 4B) (hcs, Deputy Clerk) (Entered: 03/14/2024) |
| 03/14/2024 | 114 | SCHEDULING ORDER. Signed by Judge Lydia Kay Griggsby on 3/14/2024. (bas, Deputy Clerk) (Entered: 03/15/2024) |
| 03/29/2024 | 115 | Supplement to 114 Scheduling Order filed by Brooke Lierman (Dietrich, Ryan) (Entered: 03/29/2024) |
| 03/29/2024 | 116 | Supplement to 114 Scheduling Order filed by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice (Kimberly, Michael) (Entered: 03/29/2024) |
| 04/08/2024 | 117 | Supplement to 114 Scheduling Order filed by Brooke Lierman (Dietrich, Ryan) (Entered: 04/08/2024) |
| 04/08/2024 | 118 | RESPONSE re 115 Supplement filed by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, Internet Association, NetChoice.(Kimberly, Michael) (Entered: 04/08/2024) |
| 07/03/2024 | 119 | MEMORANDUM OPINION. Signed by Judge Lydia Kay Griggsby on 7/3/2024. (mu1s, Chambers) (Entered: 07/03/2024) |
| 07/03/2024 | 120 | ORDER granting motion to dismiss Count IV of the amended complaint; denying motion for summary judgment as to Count IV of the amended complaint; and dismissing this matter. Signed by Judge Lydia Kay Griggsby on 7/3/2024. (mu1s, Chambers) (Entered: 07/03/2024) |
| 08/02/2024 | 121 | NOTICE OF APPEAL by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, NetChoice. Filing fee $ 605, receipt number AMDDC-11408541.(Kimberly, Michael) (Entered: 08/02/2024) |

JA013

| 08/05/2024 | 122 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 121 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(av4s, Deputy Clerk) (Entered: 08/05/2024) |
| --- | --- | --- |
| 08/06/2024 | 123 | USCA Case Number 24-1727 for 121 Notice of Appeal filed by Computer & Communications Industry Association, NetChoice, Chamber of Commerce of the United States of America. Case Manager - Anisha Walker (av4s, Deputy Clerk) (Entered: 08/07/2024) |
| 08/08/2024 | 124 | FINAL JUDGMENT ; Each party to bear its own costs. Signed by Judge Lydia Kay Griggsby on 8/8/2024. (bas, Deputy Clerk) (Entered: 08/08/2024) |
| 08/13/2024 | 125 | AMENDED NOTICE OF APPEAL by Chamber of Commerce of the United States of America, Computer & Communications Industry Association, NetChoice. (Attachments: # 1 Exhibit A)(Kimberly, Michael) (Entered: 08/13/2024) |
| 08/14/2024 | 126 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 125 Amended Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(av4s, Deputy Clerk) (Entered: 08/14/2024) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 10/22/2024 09:59:14 | | |
| **PACER Login:** | mw000052 | **Client Code:** | 009900-0011-25580 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00410-LKG |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

JA014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., <br><br> *Plaintiffs*, <br><br> *v.* <br><br> PETER FRANCHOT, <br><br> *Defendant*. | No. 1:21-cv-410-DKC <br><br> **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiffs the Chamber of Commerce of the United States of America, Internet Association, NetChoice, and the Computer & Communications Industry Association (collectively, Plaintiffs), for their amended complaint against Peter Franchot, in his official capacity as the Comptroller of the Treasury of Maryland, allege by and through their attorneys as follows:

**INTRODUCTION**

1.      This lawsuit seeks a declaration and injunction against enforcement of Maryland House Bill 732, as amended by Senate Bill 787, (the Act) insofar as it imposes a "Digital Advertising Gross Revenues Tax" on sellers of digital advertising services. The Act is a punitive assault on digital, but not print, advertising. It is illegal in myriad ways and should be declared unlawful and enjoined.

2.      The background leading to the Act's passage is undeniable: Maryland lawmakers disapprove of large digital advertising companies and intended to punish them. A centerpiece of the Act's legislative history is an article, authored by a witness testifying in support of the Act, which accuses large digital advertising companies of "erod[ing]" the "shared values and norms" of American society. *See* Paul Romer, *A Tax That Could Fix Big Tech*, New York Times (May 6, 2019), perma.cc/MZ83-NF5Y; *see also* Testimony from Paul Romer to Budget & Taxation Committee (Jan. 29, 2020), perma.cc/EZ4M-ZEGY. Maryland lawmakers acted on the belief that

1

JA015

large digital advertising companies are "too big to trust" and have created "a haven for dangerous misinformation and hate speech." Romer, *A Tax That Could Fix Big Tech*. In the run-up to the Act's passage, that theme was repeated over and over again by the Act's most outspoken proponents, including Senate President Bill Ferguson, who proclaimed—ironically, over Facebook—that, with the Act, Maryland lawmakers had deliberately "targeted" companies "like Amazon, Facebook, and Google." *See* perma.cc/699U-4BQB.

3.       The premise of the law is deeply flawed. Taxing digital advertising revenue will have the opposite of the Act's intended effect, reducing resources to support the creation and availability of high-quality ad-supported content, leaving the online field overrun by low-quality "junk" content. Meanwhile, the Act will raise costs for consumers and make it more difficult for businesses to connect with potential customers. Simply put, the Act will harm Marylanders and small businesses and reduce the overall quality of internet content—all while doing nothing to stave off the dissemination of misinformation and hate speech.

4.       Recognizing the Act's many infirmities, Governor Hogan vetoed the Act on May 7, 2020, calling it "misguided" and "unconscionable." *See* Letter from Governor Lawrence J. Hogan, Jr. to Senator Bill Ferguson and Representative Adrienne A. Jones (May 7, 2020), perma.cc/HC8L-FTAY. But on February 12, 2021, the General Assembly voted to override Governor Hogan's veto.

5.       On February 18, 2021, Maryland lawmakers amended the Act with Senate Bill 787. The amendment further narrows the universe of companies that must pay, making its application even more precise and targeted. And the amendment adds a pass-through prohibition, which bars targets of the charge from passing it on to downstream market participants as a separate fee, surcharge, or line item. The pass-through prohibition is meant both to muzzle speech about the charge and to ensure that the targets of the charge, and they alone, bear its burden. Court have held such measures so inherently punitive that they violate the Bill of Attainder Clause. Courts also

JA016

have held that measures preventing the direct payers of a charge from including line-item statements about the charge on invoices violate the First Amendment.

6.    Although the Act is styled as a tax, several features confirm its punitive character, including its severity (up to 10% of *gross* revenues), its focus on extraterritorial conduct, the segregation of its proceeds from the State's general fund, its pass-through prohibition, the unusually narrow scope of payers, and the legislative history leading to its enactment.

7.    The Act is unlawful in several ways. First, it is preempted by the Internet Tax Freedom Act (ITFA), which prohibits States from imposing "multiple and discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note. Second, the Act violates the Due Process Clause and Commerce Clause of the United States Constitution by burdening and penalizing purely out-of-state conduct and interfering with foreign affairs. Finally, the pass-through prohibition violates both the dormant Commerce Clause and First Amendment.

8.    The State is well aware of these defects. In a February 25, 2020 letter, the Office of the Attorney General of Maryland itself concluded that an earlier-introduced version of the Act "would likely be preempted by the ITFA" and requires revisions to avoid invalidation under the federal Commerce Clause. *See* Letter from Sandra Benson Brantley to Delegate Alonzo T. Washington (Feb. 25, 2020), perma.cc/9SNH-S3FU; *see also* Letter from Brian E. Frosh to Governor Lawrence J. Hogan, Jr. (April 22, 2020), perma.cc/Y8RD-KVDJ. The necessary revisions were never made.

9.    Plaintiffs accordingly seek a declaration that the Act is unlawful and an injunction against its enforcement.

## JURISDICTION AND VENUE

10.    Plaintiffs bring this suit under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 asserting violations of federal rights and seeking declaratory and injunctive relief. The Court's jurisdiction is invoked under 28 U.S.C. §§ 1331 and 2201.

JA017

11.     The Court is not deprived of jurisdiction by the Tax Injunction Act (TIA) because, for TIA purposes, the Act imposes a punitive fee rather than a tax. *See infra* ¶¶ 34-47, 51.

12.     This Court has personal jurisdiction over Defendant Peter Franchot because he resides within the District of Maryland and performs his official duties there.

13.     Venue is proper in this District because Franchot resides in the District and a substantial part of the events giving rise to the claims here occurred in the District.

### THE PARTIES AND STANDING

14.     Plaintiff Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation. It represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Among other things, the Chamber works with the federal, state, and foreign governments to achieve a multilateral consensus on the taxation of the digital economy. The Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C. The Act is at odds with the Chamber's policy objectives, and challenging the Act is germane to the Chamber's mission.

15.     Many of the Chamber's members will be liable to pay the charge imposed by the Act. The Act will therefore harm the Chamber's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

16.     Plaintiff Internet Association (IA) is the only trade association that exclusively represents leading global internet companies on matters of public policy. IA's mission is to foster innovation, promote economic growth, and empower people through the free and open internet. Its stated position is that state governments should not adopt taxation measures that discriminate against digital services and are not technologically neutral. IA is a 501(c)(6) nonprofit organization

JA018

headquartered in Washington, D.C. The Act is at odds with IA's policy objectives for technology companies, and challenging the Act is germane to IA's mission.

17.     A list of IA's members is available at https://internetassociation.org/our-members/. Many of IA's members will be liable to pay the charge imposed by the Act. The Act will therefore harm IA's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

18.     Plaintiff NetChoice works to make the internet safe for free enterprise and free expression. It engages at the local, state, national, and international levels to protect the interests of the internet and ensure a bright digital future. NetChoice opposes taxes that discriminate against e-commerce, which threaten the internet's benefits to consumers and small sellers online. NetChoice is a 501(c)(6) nonprofit organization headquartered in Washington, D.C. The Act is at odds with NetChoice's policy objectives, and challenging the Act is germane to NetChoice's mission.

19.     A list of NetChoice's members is available at https://netchoice.org/. Many of NetChoice's members will be liable to pay the charge imposed by the Act. The Act will therefore harm NetChoice's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

20.     Plaintiff the Computer & Communications Industry Association (CCIA) is a not-for-profit membership organization for a wide range of companies in the computer, internet, information technology, and telecommunications industries. Created over four decades ago, CCIA promotes open markets, open systems, open networks, and full, fair, and open competition. CCIA represents the interests of the world's leading providers of technology products and services before

JA019

governments and the courts. It opposes discriminatory taxes. The Act is at odds with CCIA's policy objectives, and challenging the Act is germane to CCIA's mission.

21.     A list of CCIA's members is available at https://www.ccianet.org/about/members/. Many of CCIA's members will be liable to pay the charge imposed by the Act. The Act will therefore harm CCIA's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

22.     Defendant Franchot is the Comptroller of the Treasury of Maryland. He is responsible for administering the Maryland digital advertising charge.

23.     Franchot is a resident of Maryland and is sued in his official capacity only.

24.     In enforcing, administering, and adhering to the Act, Franchot and those subject to his supervision, direction, or control will at all relevant times act under color of state law.

## FACTUAL ALLEGATIONS

### A.     The Act and its historical context

25.     The Act imposes a one-of-a-kind charge on the annual gross revenue of digital advertising services provided in Maryland. The charge applies only to digital advertising and does not apply to advertising of any kind through other means.

26.     Pursuant to Section 17 of Article II of the Maryland state constitution, the Act took effect March 14, 2021. Senate Bill 787's amendments will take effect May 12, 2021.

27.     Section 101(e)(1) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "digital advertising services" as "advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services."

28.     Section 101(e)(2) of Title 7.5 of the Maryland Tax Article, as amended by the Act, exempts from the definition of "digital advertising services" "advertisement services on digital

6

JA020

interfaces owned or operated by or operated by or operated on behalf of a broadcast entity or news media entity."

29.     Section 101(f) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "digital interface" as "any type of software, including a website, part of a website, or application, that a user is able to access."

30.     Section 101(h) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "user" as "an individual or any other person who accesses a digital interface with a device."

31.     The Act "shall be applicable" to all taxable years after December 31, 2021. *See* Senate Bill 787 § 6. Accordingly, the Act will be enforced as to all covered transactions taking place on January 1, 2022 and later. Each company that "reasonably expects . . . annual gross revenues derived from digital advertising services in the state to exceed $1,000,000" in a given year must file "a declaration of estimated tax, on or before April 15 of that year." Md. Code, Tax-Gen. § 7.5-102(b)(1).

32.     The Act charges tiered rates on the "annual gross revenues derived from digital advertising services in the State." Md. Code, Tax-Gen. § 7.5-102(b)(1).

33.     The Act bars companies from passing on the cost of the charge. Section 102(c) of the Maryland Tax Article, as amended by the Act, provides that "[a] person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item."

34.     Under Sections 13-1001 and 13-1002 of the Tax Article, as amended by the Act, failure to file complete and accurate paperwork and pay the charge as required by the Act is a criminal offense.

35.     The Act sets tiered rates of assessment on annual gross revenues derived from digital advertising services in the State, based solely on a firm's global annual gross revenues:

JA021

(a.) For firms with global annual gross revenues of $100 million or more, the Act imposes a 2.5% assessment rate on all assessable revenues.

(b.) For firms with global annual gross revenues of $1 billion or more, the Act imposes a 5.0% assessment rate on all assessable revenues.

(c.) For firms with global annual gross revenues of $5 billion or more, the Act imposes a 7.5% assessment rate on all assessable revenues.

(d.) For firms with global annual gross revenues of $15 billion or more, the Act imposes a 10% assessment rate on all assessable revenues.

36.     The extent of a company's liability under the Act for revenues earned in Maryland depends in almost all cases on the company's out-of-state conduct. For example, a company that derives $10 million in annual revenues from digital advertising in Maryland will:

(a.) not be liable for any assessment under the Act if it earns less than $90 million in revenue outside of the State;

(b.) be liable for a $250,000 assessment if it earns between $90 million and $989 million in gross annual revenues outside of the State;

(c.) be liable for a $500,000 assessment if it earns between $990 million and $4.989 billion in gross annual revenues outside of the State;

(d.) be liable for a $750,000 assessment if it earns between $4.99 billion and $14.989 billion in gross annual revenues outside of the State;

(e.) be liable for a $1,000,000 assessment if it earns more than $14.99 billion in gross annual revenues outside of the State.

37.     The only differences among the scenarios described in the immediately prior paragraph are the amounts of revenue earned outside of Maryland, and in direct consequence, the size of the charge owed under the Act.

JA022

**B.      The Act does not impose a "tax" within the meaning of the TIA**

38.      The exaction assessed by the Act is a punitive fee, penalty, or fine, and not a "tax" within the meaning of the Tax Injunction Act, 28 U.S.C. § 1341. Several features of the Act confirm this conclusion, including its extraterritoriality, narrow applicability, and assessment against gross revenue rather than net income.

39.      The Act targets a very small number of large companies, specifically including, according to Maryland lawmakers, "Amazon, Facebook, and Google." *See* perma.cc/699U-4BQB. The express exemption from liability for print, radio, and television outlets—and now also news and broadcast media companies—ensures the charge reaches only the Act's limited range of intended targets: "massive technology companies" with a predominantly internet-based presence. *See* perma.cc/N975-TAXK, at 7.

40.      This discrimination reflects a policy that the content conveyed by print, television, and radio outlets and online news and broadcast websites is acceptable, whereas the content conveyed by the narrow class of companies now subject to the exaction is harmful, and dangerous, and should be punished. That is to say, the Act disapproves of and disfavors the content conveyed by the narrow class of companies subject to the exaction.

41.      The rate of assessment under the Act is a massive share of each digital advertiser's gross—not *net*—receipts, which is a highly unusual and extraordinarily severe form of exaction. For most impacted companies, it will impose liability nearly 20 times greater than Maryland's standard corporate income tax, wiping out most digital advertisers' entire profits on services provided in Maryland. *See infra*, ¶¶ 53-55.

42.      The Act imposes progressively greater penalties on companies based on their extra-territorial conduct—the more significant a company's participation in extraterritorial markets for digital advertising, the greater the rate of assessment on revenue derived from digital advertising

JA023

in Maryland. There is no explanation for this design except a legislative purpose to punish large, out-of-state digital advertising companies for their extraterritorial activities.

43.     The legislative history indicates a punitive purpose. In the months leading up to the enactment of the Act, an op-ed appeared in the *New York Times* accusing Google and Facebook of "mak[ing] their profits using business models that erode" the "shared values and norms on which democracy depends." Paul Romer, *A Tax That Could Fix Big Tech*, New York Times (May 6, 2019), perma.cc/MZ83-NF5Y. The op-ed described large digital advertising companies as "too big to trust" and creating "a haven for dangerous misinformation and hate speech." *Id*. The op-ed called for States like Maryland to impose a "charge" or "penalty" on digital advertisers' business models, almost exactly in the form of the Act. *Id*. The Senate sponsors of the Act presented the op-ed's author, Professor Paul Romer, as a witness in support of the Act and included his op-ed in the legislative history. *See* Testimony from Paul Romer to Budget & Taxation Committee (Jan. 29, 2020), perma.cc/EZ4M-ZEGY.

44.     Professor Romer's testimony at the Senate hearing echoed his op-ed. He stated his opinion that "the market for digital services is broken and that a tax on digital advertising can help restore the conditions needed for the market to work." In his view, "the pervasive dishonesty of the people who have made hundreds of billions from targeting and tracking is the final proof that something is terribly wrong with the market for digital services." *See* Testimony from Paul Romer to Budget & Taxation Committee.[1]

---

[1]    The opinions expressed in Romer's op-ed are deeply flawed. *First*, Professor Romer does not explain why burdening digital advertising will improve the quality of content online. In fact, placing massive financial burdens on digital advertising will inhibit the primary funding source for high-quality internet content and do nothing to discourage low-quality content. They also will drive more quality content behind subscription-only paywalls, making it less accessible and encouraging an unhealthy "echo chamber" effect. *Second*, the Act will indirectly harm a wide range of other business and consumer interests, raising costs for consumers and making it harder for businesses to connect with potential consumers. The Act's design thus will not even accomplish the goal it is supposed to; indeed, it will undermine that goal.

JA024

45.     Senate President Ferguson, a sponsor of the Senate companion bill, explained that the growth of "[m]assive technology corporations . . . has resulted in negative externalities socialized and borne by the public. . . . [E]xternalities created by private actors' actions must be borne by that actor." *See* perma.cc/N975-TAXK, at 7. And he explained where the law came from: The "solution" that the Act implements "is based off a model originally built by Paul Romer . . . to levy a progressive tax on the currently untaxed revenues of companies' revenue from digital ad revenue." *Id*. Senator Ferguson then reiterated who should foot the bill—"large multinational corporations with at least $100 million in annual digital ad revenues each year"—and who should not—"Marylander[s]." *Id*. at 7-8.

46.     Under Sections 2-4A-01 and 2-4A-02 of the Tax Article, as amended by the Act, the proceeds of the Maryland digital advertising charge are used to pay for administration of the Act and otherwise deposited in the "Blueprint for Maryland's Future Fund." Proceeds deposited in the Blueprint for Maryland's Future Fund are kept segregated from the Maryland general fund and earmarked for specific educational purposes including, in part, to address through education the perceived "externalities" created by the companies targeted by the Act.

47.     The Act is akin to a penalty for perceived misconduct. In other words, it is a legislatively-mandated restitution payment as remediation for purported externalities.

48.     Delegate Alonzo Washington, the Vice Chair of the Ways and Means Committee, explained to lawmakers that "[a]s we all know, giant technology companies are increasingly collecting and utilizing our personal data" and questioned whether the conduct of such companies is "helping to build the future of democracy in our state." *See* perma.cc/QMJ7-6LJG. He also told lawmakers, "[i]t is clear that massive, multinational companies have made significant profits from targeted advertising. This bill specifically targets companies who have digital ad revenues of at least $100 million." *Id*.

JA025

49.    The pass-through prohibition expressly bars companies from "directly pass[ing] on the cost of the tax imposed under this section" to an advertising purchaser "by means of a separate fee, surcharge, or line-item." Its inclusion confirms that lawmakers want only the targets of the charge to pay. Court have held similar pass-through prohibitions so inherently punitive that they violate the Bill of Attainder Clause. *See Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338 (2d Cir. 2002). Moreover, the pass-through prohibition violates the First Amendment because it is a content-based regulation of speech. *See BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008).

50.    Many of the transactions that are governed by the pass-through prohibition are negotiated and consummated entirely outside of Maryland's borders.

51.    In the months following the Governor's veto, the Act's sponsors have continued to describe the Act as "target[ing] the largest tech companies—those with more than $100 million in annual global revenues—who store and manipulate users' personal data." *See Debate Continues*. The Act thus narrowly targets large internet advertising companies.

### C.    The word "tax" as it appears in ITFA and the TIA has different meanings

52.    Although the charge imposed by the Act is not a "tax" for purposes of the TIA, it does constitute a "tax" for purposes of ITFA preemption. In the context of two "different statutes" serving different purposes like these, singular words appearing in both statutes may be given "different shades of meaning and consequently may be variously construed." *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). The meanings of words must "vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." *Yates v. United States*, 574 U.S. 528, 538 (2015); *accord id.* at 537 ("We have several times affirmed that identical language may convey varying content when used in different statutes.").

JA026

53.     The TIA was enacted by the 75th Congress in 1937 (*see* Act of Aug. 21, 1937, ch. 726, 50 Stat. 738) and was modeled on the Anti-Injunction Act (AIA), which was enacted by the 39th Congress in 1867 (*see* Revenue Act of 1867, ch. 169, § 10, 14 Stat. 471, 475-476). ITFA, meanwhile, was enacted a generation later by the 105th Congress in 1999. And while the TIA was enacted for federalism purposes, ITFA was enacted for *federal* purposes—to prevent discriminatory state taxes that would harm the development of electronic commerce. Thus, what the 75th and 39th Congresses meant by the word "tax" in the TIA and AIA differs from the meaning ascribed to the word by the 105th Congress in ITFA, which serves a different purpose.

54.     This is made clear by the express definition that the 105th Congress gave to the word "tax" in ITFA. According to that definition, a "tax" within the meaning of ITFA includes any "charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes" other than use fees, *i.e.*, "fee[s] imposed for a specific privilege, service, or benefit conferred." 47 U.S.C. § 151 note § 1105(8)(A)(i). Thus, any governmental "charge" that is not a use fee is a "tax" within the meaning of ITFA.

55.     ITFA's definition of a prohibited "tax" is substantially broader than courts' interpretation of the word "tax" under the TIA. At the time the TIA was enacted in 1937, the Supreme Court had held expressly of the AIA that "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment," subject to challenge in court. *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922). Courts have carried that understanding forward in contemporary TIA cases, holding that government charges that have "regulatory or punitive purposes" are not "taxes" within the meaning of the TIA. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007) (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000)). In the same vein, courts have recognized that charges collected "to defray the expense" of externalities are not "taxes" for TIA purposes. *San Juan Cellular Tel. Co.*

*v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.) (quoting *Head Money Cases*, 112 U.S. 580, 590 (1884)).

56.　Government charges can "serve more than one purpose." *Austin v. United States*, 509 U.S. 602, 610 (1993). Generally speaking, "all charges raise revenue" and bear that purpose in addition to others. *Am. Council of Life Insurers v. D.C. Health Benefits Exch. Auth.*, 815 F.3d 17, 19 (D.C. Cir. 2016). Thus, even charges with regulatory or punitive purposes that would fall outside the TIA may also have revenue-generating purposes that bring them within the broad definition of "tax" included in ITFA.

### D.　The Act is extraordinarily burdensome

57.　Corporate income taxes are traditionally assessed against net income on a flat-rate basis. Maryland's corporate income tax rate is a flat 8.25% assessed against net income. Thus, a global company with $15 billion in revenue and $1 billion in profits, with 2% of its revenues and profits apportioned to Maryland, would pay a corporate income tax of $1.65 million on $20 million of Maryland-originated pre-tax profit.

58.　The Maryland digital advertising charge applies in addition to Maryland's standard corporate income tax. If all of the revenues of the company described in the immediately prior paragraph were derived from digital advertising, the company would be liable for an additional $30 million under the Act—10% of 2% of $15 billion. That is nearly 20 times the rate of the corporate income tax. And it would more than wipe out the $20 million in profits attributable to the company's economic activity in Maryland.

59.　Assessments against gross revenues apply even to unprofitable businesses.

60.　It is widely recognized that "gross revenue" is not "a usual [or] appropriate basis for taxation." U.S. Trade Rep., *Report on France's Digital Services Tax* 55 (Dec. 2, 2019), https://perma.cc/E7BG-6KJF (*USTR Report*). Assessments against gross revenue rather than net income are therefore highly unusual in American and international law.

JA028

61.     They also create a cascading (or pyramiding) effect that embeds taxes within taxes, through each stage of a production chain. For example, an advertising agency that brokers a particular sale of digital advertising will be liable under the Act. So too will be the digital advertising company whose services are brokered, meaning that the same digital advertising service will be subjected to a double penalty of two consecutive gross-receipts charges under the Act—each time at a rate that independently would often make earning a profit impossible.

62.     Several European countries, including Great Britain, France, Hungary, Italy, Spain, and Turkey, have proposed or implemented digital services charges (albeit at much lower rates) targeted at American digital platforms.

63.     The federal government has opposed these digital advertising charges as both protectionist and a form of double taxation at odds with sound principles of taxation across multiple jurisdictions. For example, federal authorities have objected to France's digital advertising charge because it, like the Act, has high revenue thresholds that effectively exclude French companies from the charge.

64.     The U.S. Trade Representative recently concluded that the French law, which bears close resemblance to the Act at issue here, was "highly unusual" as a tax, "unfair," "unusually burdensome," extraterritorial in scope, and discriminatory—together justifying imposing retaliatory tariffs. *See USTR Report* at 31, 49-50, 55, 65-67; *id.* at 1 (concluding that France's Digital Services Tax "discriminates against U.S. companies and is inconsistent with prevailing principles of tax policy and unusually burdensome for affected U.S. companies"). It found in particular that the French law reflects "a purpose of penalizing particular technology companies for their commercial success." *Id.* at 10 (citing *Initiation of a Section 301 Investigation of France's Digital Services Tax*, 84 Fed. Reg. 34,042, 34,043 (July 16, 2019)).

JA029

**E.      Nearly all relevant conduct takes place outside of Maryland**

65.      Nearly all online digital advertising services charge fees to advertising clients using either the "pay per click" model (the client pays each time a user clicks on the ad) or the "cost per thousand" model (the client pays for each 1,000 user impressions, regardless of clicks). Digital advertising companies responsible for paying the charge imposed by the Act are sometimes unable to determine where users are physically located when they click on or view an advertisement.

66.      Many online advertisements are viewed on mobile devices. Many Maryland residents commute on a daily basis to different jurisdictions, including Delaware, the District of Columbia, Pennsylvania, Virginia, and West Virginia. And Maryland residents sometimes use mobile devices to view advertisements while physically present in other jurisdictions.

67.      Large online digital advertising companies operating internationally have global gross annual revenues that meet the threshold for the Act's highest assessment rate, as intended by the General Assembly. The Act's high revenue thresholds exclude Maryland companies from their scope, and the highest rates apply exclusively to companies located outside Maryland.

68.      The vast majority of the global gross annual revenues of large online digital advertising companies are earned outside of Maryland.

69.      Advertising agencies broker ad sales for online digital advertising platforms. On information and belief, all Maryland-based companies that broker sales of digital advertising services have global gross annual revenues of less than $100 million.

**F.      Kinds of advertising affected by the Act**

70.      Many companies use websites to deliver digital advertising content to visitors.

71.      Online publishers include content aggregators along with search engines, social media websites, online shopping websites, streaming video websites, and more.

72.      When a user submits a query on an online search engine, the search engine typically returns several advertising results at the top of the results page. Search-engine marketing of this

JA030

kind allows advertisers to target a particular audience efficiently, based on factors like location and user interests, as expressed in their search terms.

73.     Other websites supplement their own content with third-party display ads. These websites often hire display-ad networks to select and deliver the display ads. Display ads are common on shopping websites and social media platforms, which deliver third-party advertisements tailored to their users' demographics and interest groupings.

74.     Online digital advertising has dramatically lowered merchants' cost of customer acquisition over the past 20 years, increasing return on companies' investments in advertising, and reducing the volume of irrelevant advertisements that consumers see.

75.     Online advertising is almost twice as efficient as traditional television advertising in converting advertising spend into sales revenue. And it is particularly valuable for small businesses that cannot afford expensive television, radio, or print ad campaigns. Digital advertising allows those merchants to start small, focus on the most relevant audience, and expand a campaign if it attracts new business.

## CLAIMS FOR RELIEF
### COUNT I
### VIOLATION OF THE INTERNET TAX FREEDOM ACT
### (CHALLENGE TO IMPOSITION OF THE CHARGE)

76.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

77.     The Act is unlawful under the Internet Tax Freedom Act, which prohibits States from imposing "[m]ultiple or discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note. The Act imposes a "tax" within the meaning of ITFA because it is a governmental charge with revenue-generating purposes and is not a fee assessed for a specific privilege, service, or benefit conferred. The Act's charge is preempted because it is both a "discriminatory" tax and a "multiple" tax under ITFA.

JA031

78.     ITFA defines "discriminatory tax" (47 U.S.C. § 151 note § 1105(2)) as a state-imposed charge on transactions in electronic commerce that (i) "is not generally imposed and legally collectible by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means"; (ii) "is not generally imposed and legally collectible at the same rate by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means"; or (iii) "imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means."

79.     The Act imposes a charge on digital advertising delivered over the internet without applying a similar charge to non-digital advertising. Thus, the Act's charge is unlawfully "discriminatory" within the meaning of ITFA.

80.     ITFA defines "multiple tax" (47 U.S.C. § 151 note § 1105(6)(A)) as "any tax that is imposed by one State or political subdivision thereof on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State or political subdivision thereof (whether or not at the same rate or on the same basis), without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions."

81.     The Act imposes a charge on digital advertising for extraterritorial commerce that is taxed by the States in which that commerce actually takes place, without a credit for those other taxes. Thus, the Act's charge is an unlawful "multiple" tax within the meaning of ITFA.

## COUNT II
## VIOLATION OF THE COMMERCE CLAUSE
### (CHALLENGE TO IMPOSITION OF THE CHARGE)

82.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

83.     The "negative" or "dormant" Commerce Clause prohibits States from regulating or burdening out-of-state commerce, penalizing extraterritorial conduct, or imposing charges that have the purpose or effect of discriminating against interstate commerce.

JA032

84.     The extent of a company's liability under the Act for each dollar earned from digital advertising in Maryland depends in almost all cases on the company's extraterritorial conduct. By imposing progressively greater liability on companies for the revenue they earn outside of Maryland, the Act regulates, punishes, and burdens extraterritorial conduct and the earning of revenues that are not fairly attributable to economic activity in Maryland.

85.     The Act favors in-state companies, exceedingly few of which will be subject to the charge imposed by the Act, even if they engage in the sale of some digital advertising. Liability imposed by the Act will be borne almost entirely by out-of-state companies based on their out-of-state conduct.

86.     The effects of the Act on interstate commerce are more than incidental. The Act will impose substantial costs on out-of-state and interstate transactions, in excess of all of a company's profits earned from digital advertising in Maryland. And the burdens on interstate commerce inflicted by the Act are excessive in relation to any putative local benefit.

87.     State laws are further unconstitutional under the Commerce Clause if they create a substantial risk of conflicts with foreign governments or otherwise undermine the ability of the federal government to speak with one voice with respect to foreign affairs.

88.     Maryland's imposition of a digital advertising charge exacerbates a foreign policy dispute with France and other European countries and makes it impossible for the federal government to speak with one voice on a matter of foreign policy.

**COUNT III**
**VIOLATION OF THE DUE PROCESS CLAUSE**
**(CHALLENGE TO IMPOSITION OF THE CHARGE AND**
**THE PASS-THROUGH PROHIBITION)**

89.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

90.     The Due Process Clause of the Fourteenth Amendment prohibits States from punishing or regulating extraterritorial conduct or activities.

JA033

91.     The extent of a company's liability under the Act for each dollar earned from digital advertising in Maryland depends in almost all cases on the company's extraterritorial conduct.

92.     By imposing progressively greater liability on companies for their extraterritorial conduct, the Act punishes conduct and the earning of revenues outside of Maryland. Liability imposed by the Act will be borne almost entirely by out-of-state companies based on their out-of-state conduct.

93.     The pass-through prohibition also directly regulates extraterritorial conduct by prohibiting regulated companies from passing on the cost of the charge imposed, including in transactions taking place wholly outside Maryland's geographic borders.

### COUNT IV
### VIOLATION OF THE COMMERCE CLAUSE AND FIRST AMENDMENT
### (CHALLENGE TO THE PASS-THROUGH PROHIBITION)

94.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

95.     If the pass-through prohibition is interpreted to prohibit the targets of the Act from passing on the charge to downstream market participants at all, it regulates conduct. That is, it forbids the assessment and recoupment of the Act's charge in subsequent commercial transactions. Some such transactions take place outside the territorial limits of Maryland.

(a.)     If the range of subsequent transactions covered by the pass-through prohibition is interpreted to include those taking place wholly outside Maryland's geographic borders, the pass-through prohibition violates the dormant Commerce Clause because it regulates extraterritorial conduct.

(b.)     If the range of subsequent transactions covered by the pass-through prohibition is interpreted to include only those taking place within Maryland's geographic borders, the pass-through prohibition violates the dormant Commerce Clause by unjustifiably favoring in-state purchasers (as to whom the Act's charge cannot be passed on) and disfavoring out-of-state purchasers (as to whom the charge can be passed on).

JA034

96.     If the pass-through prohibition is interpreted to prohibit companies from including a separate fee, surcharge, or line-item on bills, invoices, receipts, or the like to pass on the Act's charge, it is also a content-based regulation of speech.

(a.)     The inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge is core political speech concerning who bears responsibility for the charge (lawmakers) and ultimately the burden of the charge (consumers). Forbidding the direct payers of the charge from including a separate fee, surcharge, or line-item—while at the same time permitting them to raise prices to accomplish the same practical effect—is a suppression of speech that insulates lawmakers from responsibility for the Act. As a regulation of core political speech, the pass-through prohibition is not narrowly tailored to serve a compelling state interest and is therefore unlawful.

(b.)     Alternatively, the inclusion on an invoice of a separate fee, surcharge, or line-item to recoup the Act's charge is commercial speech. If so, the pass-through prohibition violates the First Amendment because it does not regulate misleading or fraudulent speech; does not directly advance a substantial governmental interest; and is more extensive than necessary to serve any conceivable interests that it might further. It is therefore unlawful.

JA035

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    declare the Act preempted and unconstitutional insofar as it imposes a "Digital Advertising Gross Revenues Tax";

2.    declare the Act unconstitutional insofar as it prohibits the assessment and recoupment of the Act's charge in subsequent commercial transactions and forbids the inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge;

3.    permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the Act insofar as it imposes a "Digital Advertising Gross Revenues Tax," prohibits the assessment and recoupment of the Act's charge in subsequent commercial transactions, and forbids the inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge;

4.    grant such additional or other relief as it deems just and proper.

Dated: April 30, 2021                          Respectfully submitted,

                                               */s/ Michael B. Kimberly*

                                               Michael B. Kimberly (Bar No. 19086)
                                               Paul W. Hughes (Bar No. 28967)
Tara S. Morrissey (*pro hac vice*)             Stephen P. Kranz (*pro hac vice*)
Jennifer B. Dickey (*pro hac vice*)            Sarah P. Hogarth (*pro hac vice*)

U.S. CHAMBER LITIGATION CENTER                 MCDERMOTT WILL & EMERY LLP
1615 H Street, N.W.                            500 North Capitol Street NW
Washington, DC  20062                          Washington, DC 20001
  tmorrissey@uschamber.com                     mkimberly@mwe.com
(202) 463-5337                                 (202) 756-8000

*Attorneys for the Chamber of Commerce*        *Attorneys for All Plaintiffs*
*of the United States of America*

DM_US 179109874-4.096553.1630

JA036

# EXHIBIT 4

JA037

**SB 787**

# Department of Legislative Services
Maryland General Assembly
2021 Session

### FISCAL AND POLICY NOTE
**Enrolled - Revised**

Senate Bill 787                    (Senator Ferguson)

Budget and Taxation                                        Ways and Means

---

**Digital Advertising Gross Revenues, Income, Sales and Use, and Tobacco Taxes - Alterations and Implementation**

---

This emergency bill (1) exempts a broadcast entity and news media entity from the digital advertising gross revenues tax enacted by Chapter 37 of 2021; (2) prohibits a person from directly passing on the cost of the digital advertising gross revenues tax to a customer through a separate fee, surcharge, or line-item; (3) alters certain dates and intent language related to the tobacco tax increases enacted by Chapter 37; (4) generally clarifies the implementation of Chapter 38 of 2021 which imposes the State sales and use tax on specified digital products; and (5) creates a subtraction modification against the State income tax for certain utility arrearage amounts forgiven in tax year 2021. The bill specifies that (1) the income tax provision applies to taxable years beginning after December 31, 2019, and (2) the digital advertising gross revenues tax applies to taxable years beginning after December 31, 2021.

---

## Fiscal Summary

**State Effect:** Special fund revenues may decrease beginning in FY 2022 as a result of the digital advertising gross revenues tax and sales and use tax exemptions for digital products and codes proposed by the bill and a delayed effective date. General fund revenues may decrease in FY 2021 to the extent subtraction modifications are claimed against the income tax. State expenditures are not affected.

**Local Effect:** Local income tax revenues may decrease in FY 2021 due to subtraction modifications claimed against the income tax.

**Small Business Effect:** None.

---

JA038

# Analysis

**Bill Summary:**

*Digital Advertising Gross Revenues Tax*

The bill exempts a broadcast entity and news media entity from the digital advertising gross revenues tax by establishing that digital advertising services do not include advertisement services on digital interfaces owned or operated by or operated on behalf of a broadcast entity or news media entity.

A broadcast entity is an entity that is primarily engaged in the business of operating a broadcast television or radio station. A news media entity is an entity engaged primarily in the business of newsgathering, reporting, or publishing articles or commentary about news, current events, culture, or other matters of public interest. A news media entity does not include an entity that is primarily an aggregator or republisher of third-party content.

The bill also prohibits a person who derives gross revenues from digital advertising services in the State from directly passing on the cost of the tax imposed to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item.

*Digital Products and Codes*

The bill specifies which existing sales and use tax exemptions and other provisions of law governing the sales and use tax apply to digital products and codes. In addition, the definitions of digital product and digital code are altered. Certain types of digital instruction, seminars, discussions, and professional services are excluded from the definition of digital product. A digital code is defined to include a number, symbol, alphanumeric sequence, barcode, or similar code.

*Tobacco Tax*

As part of the increase in certain tobacco taxes, Chapter 37 imposes a one-time floor tax on cigarettes and other tobacco products (OTP) in fiscal 2021. The bill specifies that the floor tax applies to products used, possessed, or held in the State on or after March 14, 2021, and that the Comptroller must remit the revenue attributable to the tax by June 13, 2021. Chapter 37 required the Comptroller to report by December 31, 2020, to the Senate Budget and Taxation Committee and the House Ways and Means Committee the change in consumption of cigarettes, other tobacco products, and electronic smoking devices (ESD) in the State over the immediately preceding 12 months. The bill delays this requirement by one year.

SB 787/ Page 2

JA039

Chapter 37 stated that it is the intent of the General Assembly that the Comptroller distribute, as necessary, fiscal 2021 tobacco taxes generated by the bill, including the sales tax imposed on ESD, to the Rainy Day Fund and to the expenditure accounts of the appropriate units of State government to fund costs associated with COVID-19. The bill eliminates this intent language.

*Forgiven Utility Arrearages Subtraction Modification*

A taxpayer can claim a subtraction modification for the amount of utility arrearages forgiven in tax year 2021, if the forgiveness of the utility arrearages was pursuant to grants provided to utilities under Chapter 39 of 2021.

**Current Law:**  During the 2020 session, the General Assembly passed House 732 and House Bill 932. The Governor vetoed each bill, but the General Assembly overrode the vetoes during the 2021 session, and the bills became Chapter 37 and Chapter 38 of 2021, respectively.

*Digital Advertising Gross Revenues Tax*

Chapter 37 imposes a tax on the gross revenues of specified digital advertising. Chapter 37 also (1) increases various taxes imposed on cigarettes, ESD, and OTP and (2) requires the Governor to include at least $18.25 million in annual funding for the Tobacco Use Prevention and Cessation Program beginning in fiscal 2022.

Chapter 37 imposes a tax on the annual gross revenues of a person derived from digital advertising services in the State. Chapter 37 provides for the filing of the tax returns and making tax payments.

The part of the annual gross revenues of a person derived from digital advertising services in the State are to be determined using an apportionment fraction based on the annual gross revenues of a person derived from digital advertising services in the State and the annual gross revenues of a person derived from digital advertising services in the United States. The Comptroller is required to adopt regulations that determine the state from which revenues from digital advertising services are derived.

The digital advertising gross revenues tax is imposed at the following rates:

- 2.5% of the assessable base for a person with global annual gross revenues of $100.0 million through $1.0 billion;
- 5% of the assessable base for a person with global annual gross revenues of $1.0 billion through $5.0 billion;

- 7.5% of the assessable base for a person with global annual gross revenues of $5.0 billion through $15.0 billion; and
- 10% of the assessable base for a person with global annual gross revenues exceeding $15.0 billion.

Revenues from the digital advertising gross revenues tax are distributed to the Blueprint for Maryland's Future Fund, after the Comptroller's costs to administer the tax are deducted.

*Digital Products and Codes*

Chapter 38 imposes the sales and use tax on specified digital products and codes and requires the sales and use tax revenue from each sale to be distributed to the Blueprint for Maryland's Future Fund.

A digital product is defined as a product that is obtained electronically by the buyer or delivered by means other than tangible storage media through the use of technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities.

A digital product includes:

- a work that results from the fixation of a series of sounds that are transferred electronically, including prerecorded or live music or performances, readings of books or other written materials, and speeches and audio greeting cards sent by email;
- a digitized sound file, such as a ring tone, that is downloaded onto a device and may be used to alert the user of the device with respect to a communication;
- a series of related images that, when shown in succession, impart an impression of motion, together with any accompanying sounds, that are transferred electronically, including motion pictures, musical videos, news and entertainment programs, live events, video greeting cards sent by email, and video or electronic games;
- a book, generally known as an "e-book," that is transferred electronically; and
- a newspaper, magazine, periodical, chat room discussion, weblog, or other similar product that is transferred electronically.

A digital code is defined as a code that may be obtained by any means, including in a tangible form, such as a card or through email, and provides a buyer with a right to obtain one or more digital products. A digital code does not include a gift certificate or gift card with a monetary value that may be redeemable for an item other than a digital product.

An end user is any person other than a person who receives by contract a digital product transferred electronically for further commercial broadcast, rebroadcast, transmission, retransmission, licensing, relicensing, distribution, redistribution, or exhibition of the product, in whole or in part, to another person.

The bill requires that the retail sale of a digital code or digital product must be presumed to be made in the state in which the customer's tax address is located.

A customer tax address, as it relates to a sale of a digital product, will vary according to the nature of the sale, as well as information that is available to a vendor at the time of sale of a digital product. Customer tax address may be (1) the address of the business location, for a digital product that is received by a buyer at the business location of the vendor; (2) the primary use location of the digital product; (3) the location where the digital product is received by the buyer, or donee of the buyer; (4) the location indicated by the address for the buyer according to specified business records; (5) the location indicated by an address for the buyer obtained during the sale, as specified; or (6) other locations determined by the vendor, provided that the location is consistently used by the vendor for all sales to which an item applies, as specified.

Primary use location is the street address that is representative of where the buyer's use of a digital product will primarily occur, as determined by (1) the residential street address or a business address of the actual end user of the digital product, as specified or (2) the location of the buyer's employees or equipment that makes use of the digital product if the buyer is not an individual. A primary use location does not include the location of a person who uses a digital product as the purchaser of a separate good or service from the buyer.

Subscription, as it relates to a digital product, is an arrangement with a vendor that grants a buyer the right to obtain digital products from within one or more product categories having the same tax treatment, in a fixed quantity or for a fixed period of time, or both.

*Tobacco Taxes*

Chapter 37 increases the tobacco tax rate from $2.00 to $3.75 per pack of cigarettes and increases the OTP tax rate for all products other than cigars and pipe tobacco from 30% to 53% of the wholesale price. Chapter 37 also increases the sales and use tax rate imposed ESD. These devices are commonly known as e-cigarettes or vaping products.

*Forgiven Utility Arrearages Subtraction Modification*

Under the federal income tax, if a person owes a debt to someone else and the debt is canceled or forgiven for less than its full amount, the amount of the canceled indebtedness may be required to be reported as income under certain circumstances. The State generally

conforms to the federal tax treatment of canceled debts, foreclosures, repossessions, and abandonments. The amount of income that must be realized or excluded for State income tax purposes in these circumstances is determined under the federal income tax.

On February 15, 2021, the Governor signed Senate Bill 496 (Chapter 39), the Recovery for the Economy, Livelihoods, Industries, Entrepreneurs, and Families (RELIEF) Act, emergency legislation designed to provide income tax relief to certain taxpayers, economic impact payments of up to $500 to certain taxpayers, and other forms of more immediate assistance to businesses and employers impacted by the COVID-19 pandemic. As part of this assistance, the Act authorized the Public Service Commission to distribute grants to utility companies to assist households with utility arrearages.

**State Revenues:**

*Digital Advertising Gross Revenues Tax*

The fiscal and policy note for Chapter 37 estimated that annual revenues for the Blueprint for Maryland's Future Fund from the digital advertising gross revenues tax may increase by as much as $250 million under one set of assumptions. The exemption proposed by the bill may reduce the overall revenue impact of the digital advertising tax provisions of Chapter 37; however, the amount of the revenue decrease cannot be reliably estimated due to a lack of data regarding the amount of digital advertising revenues generated by broadcast and news media entities.

*Digital Products and Codes*

The fiscal and policy note for Chapter 38 estimated that annual revenues for the Blueprint for Maryland's Future Fund from the sales and use tax on digital products and codes may increase by as much as $83.1 million in fiscal 2021 and by $118.6 million in fiscal 2025 under one set of assumptions. The clarifications and exemptions proposed by the bill may reduce the overall revenue impact of the sales and use tax provisions of Chapter 38; however, the amount of the revenue decrease cannot be reliably estimated due to a lack of data regarding the amount of digital products and codes that may be purchased in the State.

*Forgiven Utility Arrearages Subtraction Modification*

A taxpayer can claim a subtraction modification for the amount of utility arrearages forgiven in tax year 2021, if the forgiveness of the utility arrearages was pursuant to grants provided to utilities under Chapter 39 of 2021. As a result, general fund revenues may decrease in fiscal 2021 due to subtraction modifications claimed against the State income tax. Revenue losses will occur only to the extent the grants provided to utility companies

under the RELIEF Act trigger federal cancellation of debt income provisions and require taxpayers to report as income the amount of forgiven utility arrearage.

The tobacco tax provisions of the bill do not materially impact State revenues.

---

## Additional Information

**Prior Introductions:**  None.

**Designated Cross File:**  HB 1200 (Delegate Luedtke) - Ways and Means.

**Information Source(s):**  Comptroller's Office; Department of Legislative Services

**Fiscal Note History:**  First Reader - February 15, 2021
rh/hlb                              Third Reader - March 24, 2021
                                            Revised - Amendment(s) - March 24, 2021
                                    Enrolled - May 18, 2021
                                            Revised - Amendment(s) - May 18, 2021

---

Analysis by:   Michael Sanelli/             Direct Inquiries to:
Robert J. Rehrmann                           (410) 946-5510
                                             (301) 970-5510

JA044

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | * |
| | * |
| *Plaintiffs*, | * |
| | * |
| v. | * |
| | * |
| PETER FRANCHOT, | * |
| *Defendant*. | * |

No. 1:21-cv-00410-LKG

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**JOINT STATUS REPORT**

Pursuant to the Court's direction at the conclusion of its Memorandum Opinion and Order dated March 31, 2022 (ECF No. 67), the parties respectfully submit this joint status report indicating their respective views on how this matter should proceed, including a proposed schedule.

**I.     The parties stipulate to the following:**

    a.    Tax-General § 7.5-102(c) does not prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax imposed under Tax-General § 7.5-102 by factoring such cost into its customer pricing. The cost of the tax is passed on directly only when it is imposed on the customer by means of a "separate fee, surcharge, or line-item."

    b.    In light of the foregoing stipulation, plaintiffs withdraw that part of the Amended Complaint claiming that Tax-General § 7.5-102(c) violates the Commerce Clause or dormant Commerce Clause.

JA045

## II.    Plaintiffs' position

Defendants moved to dismiss (ECF No. 29) plaintiffs' amended complaint (ECF No. 25) under both rules 12(b)(1) and 12(b)(6). Plaintiffs responded with an opposition brief combined with a cross-motion for summary judgment (ECF No. 31) as to each claim. The Court's March 31, 2022 Memorandum Opinion and Order dismissed counts I-III of the complaint under Rule 12(b)(1), holding that the Tax Injunction Act bars the claims. It rejected, however, the State's TIA arguments with respect to Count IV and thus declined to dismiss that count. It is plaintiffs' position that neither the State's motion to dismiss that count under Rule 12(b)(6) nor plaintiffs' cross-motion for summary judgment on that count is moot. As narrowed by the parties' stipulation in this joint status report, Count IV is purely legal and requires no discovery. Both motions as to Count IV are thus ripe for decision.

The Court may nonetheless benefit from supplemental briefs that further clarify the issues in light of the Court's March 31 order and the parties' stipulation in this joint status report. If so, we propose that it afford the parties three weeks—to and including April 25, 2022—within which to file a single set of simultaneous supplemental briefs. In light of the extensive prior briefing, plaintiffs do not believe that supplemental replies are necessary or warranted.

If the Court orders simultaneous supplemental briefs as proposed, we request an oral argument to take place in May. If the Court does not order supplemental briefs, we request an oral argument at the Court's earliest convenience.

## III.    Defendant's position:

a.    Motions. Although the Court ruled on defendant's motion to dismiss Court IV under Rule 12(b)(1), it did not rule on defendant's motion to dismiss Count IV for failure to state a claim under Rule 12(b)(6).  Thus, in Defendant's view, that part of the motion to dismiss is still outstanding.  For the same reasons, plaintiffs' cross-

JA046

motion for summary judgment on the merits of Count IV is not moot but is still pending.

b.      Supplemental briefing on outstanding motions:        Any supplemental briefing on the outstanding motions should provide for simultaneous filing of the parties' supplemental briefs within 3 weeks of the Court's request, with both sides having the option to file a reply brief within 3 weeks of the filing of the initial supplemental brief.

c.      Answer. Defendant is prepared to file an answer within 14 days if the Court denies defendant's pending motion.

d.      Defendant requests that the Court schedule argument on the outstanding motions. If oral argument cannot be scheduled in May, defendant requests that it be scheduled after July 11, 2022 as none of the undersigned counsel for defendant will be available in June due to previously scheduled matters.

April 4, 2022                               Respectfully submitted,

*/s/ Michael B. Kimberly*                   Brian E. Frosh
(with permission)                          Attorney General of Maryland

Michael B. Kimberly                        */s/ Julia Doyle Bernhardt*
McDermott Will & Emery LLP                 Julia Doyle Bernhardt (Bar No. 25300)
500 North Capitol Street NW                jbernhardt@oag.state.md.us
Washington, DC 20001
(202) 756-8000                             */s/ Steven M. Sullivan*
                                           Steven M. Sullivan (Bar No. 24930
Attorney for Plaintiffs                    ssullivan@oag.state.md.us
                                           Assistant Attorneys General
                                           200 Saint Paul Place, 20th Floor
                                           Baltimore, Maryland 21202

JA047

_/s/ Brian L. Oliner_
Brian L. Oliner (Bar No. 05780)
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404

Attorneys for Defendant

JA048

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | * |
| | * |
| *Plaintiffs*, | * |
| | * |
| v. | * |
| | * |
| BROOKE LIERMAN, | * |
| | * |
| *Defendant*. | * |

No. 1:21-cv-00410-LKG

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANT'S SUPPLEMENTAL BRIEF
## REGARDING THE INTERPRETATION
## OF THE PASS-THROUGH PROVISION

During a telephonic status conference held on March 14, 2024, and in an order dated the same day, this Court ordered "briefing of [the parties'] views on the meaning of the pass-through provision[.]" (ECF 114.). The pass-through provision, which is set forth in § 7.5-102(c) of the Tax-General Article of the Maryland Code, states as follows:

> A person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item.

Md. Code Ann., Tax-Gen. § 7.5-102(c) (LexisNexis 2022).

As detailed below, defendant Brooke Lierman (hereinafter referenced as the "State") continues to adhere to the interpretation of the pass-through provision as expressed

through (1) a stipulation entered into between the parties, and (2) previous briefing in this matter.

On April 4, 2022, the parties filed a joint status report with this Court in which they stipulated to the following interpretation of the pass-through provision:

> Tax-General § 7.5-102(c) does not prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax imposed under Tax-General § 7-5-102 by factoring such cost into its customer pricing.  The cost of the tax is passed on directly only when it is imposed on the customer by means of a "separate fee, surcharge, or line-item."

(ECF 68 at 1.)

As noted above, the State continues to adhere to this interpretation.  Indeed, in light of the statute's use of the term "directly," it is clear that the pass-through provision is implicated only when an entity *expressly* imposes on its customers the responsibility for the tax (and only by means of a "separate fee, surcharge, or line-item").  The pass-through provision therefore (1) does not affect an entity's internal-facing deliberations or accounting regarding the amount to charge for its services, (2) does not impose any restriction on the amount that an entity may in fact charge, and in turn (3) does not prohibit an entity from factoring the estimated cost of the tax into the price that it ultimately charges its customers.  This interpretation is consistent not only with the parties' stipulation, but with the position the State has adopted throughout this litigation.  *See, e.g.*, ECF 72 at 4 ("But [plaintiff's argument] rests on the false premise that there is no meaningful economic difference between 'factoring [the costs of the tax] into customer pricing,' ECF 68 at 1, *which is permitted*, and 'directly pass[ing] on the cost of the tax imposed . . . to a customer,'

JA050

§ 7.[5]-102(c), which is prohibited." (emphasis added)); ECF 72 at 6 (stating that Maryland's law "enable[s] a taxed business to recover the cost of the tax indirectly by factoring its operating overhead into price determinations").

Moreover, throughout this litigation the State has consistently advanced an interpretation recognizing that, although the statute prohibits an entity from passing on the cost of the tax "directly . . . by means of a separate fee, surcharge, or line-item," the pass-through provision does not impose any restriction on an entity's ability to convey information about the tax (or its effect on customer pricing) through other means.  For example, in its supplemental brief in support of its motion to dismiss plaintiffs' First Amendment claim, the State declared that

> [n]either [Tax-General] § 7.5-102(c) nor any provision of the Act bans speech, and nothing in the law prevents, or even discourages, a taxpayer from including on an invoice any "political speech" the taxpayer wishes to convey to the customer.  If, for example, the taxpayer wishes to inform the customer that the invoiced charge is higher than it might otherwise be due to the imposition of the digital ad tax, the taxpayer is free to communicate that or any other message.  Indeed, if the taxpayer wants to use the invoice as an opportunity to engage in political speech, the taxpayer is free to express its displeasure with the tax and identify "who bears political responsibility for [the] new tax." . . . Maryland's statute places no restriction on stating or referencing the tax.

(ECF 71 at 2-4.)

And in its responsive supplemental brief in support of its motion to dismiss, the State continued,

> So long as the taxpayer does not "directly pass on the cost of the tax imposed . . . to a customer . . . by means of a separate fee, surcharge, or line-item," Md. Code Ann., Tax-Gen. § 7-5-102(c), the statute places no limitations or constraints on what the taxpayer can communicate about the tax, whether it

JA051

be stating the amount of digital ad tax or expressing any views the taxpayer might have about the tax.

*     *     *

The statute adopted by Maryland clearly informs the public as to what conduct constitutes "directly pass[ing] on the cost of the tax," by specifying that the pass-through proscribed is one effected "by means of a separate fee, surcharge, or line-item." § 7.5-102(c). . . .  On the other hand, neither Tax-General § 7.5-102(c) nor any provision of the Act contains any language prohibiting anyone from "separately stat[ing] the tax," or mentioning any other facts pertinent to the tax, whether on an invoice or anywhere else.

(ECF 72 at 1, 5-6); *see also* ECF 72 at 7 ("In this case, plaintiffs' member companies are . . . 'free to inform' their customers of the amount of the digital ad services gross revenue tax reflected in the purchase price."); ECF 72 at 9 ("Maryland's law contains no provision prohibiting stating the tax or anything about the tax.").

Finally, in its supplemental brief regarding commercial speech analysis, the State affirmed this interpretation:

[So long as it does not "directly pass on the cost of the tax . . . by means of a separate fee, surcharge, or line-item," t]he statute would not prevent a taxpayer from including on an invoice whatever message it wished to convey about the digital ad tax, including the amount of the taxpayer's annual digital ad gross revenue tax estimated to be attributable to the invoiced transaction, or, indeed, any other subject.

(ECF 81 at 3-4.)

Although this Court's March 14, 2024 order requested that the parties discuss their interpretation of the pass-through provision generally, the State welcomes the opportunity to further discuss the interpretation of the provision as it relates to any particular circumstances raised by the Court.

JA052

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich
_____
Julia Doyle
Federal Bar. No. 25300
Ryan R. Dietrich
Federal Bar No. 27945
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jdoyle@oag.state.md.us
(410) 576-7291
(410) 576-6955 (facsimile)

March 29, 2024                    Attorneys for Defendant

JA053

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

*Plaintiffs*,

v.                                                                  No. 1:21-cv-410-LKG

BROOKE E. LIERMAN,

*Defendant.*

**PLAINTIFFS' SUPPLEMENTAL OPENING BRIEF**
**ON THE MEANING OF THE PASS-THROUGH PROVISION**

Pursuant to the Court's March 14, 2024, scheduling order, plaintiffs respectfully submit this supplemental brief addressing the proper interpretation of the pass-through provision, Tax-Gen. § 7.5-102(c). The provision specifies that a taxpayer "may not directly pass on the cost of the tax imposed under this section to a customer . . . by means of a separate fee, surcharge, or line-item." *Id.*

Earlier in these proceedings, plaintiffs and the State jointly stipulated that the pass-through provision does not prohibit taxpayers from "*indirectly* passing on the cost of the tax" by raising their downstream prices as a general matter. *See* Dkt. 68 at 1 (emphasis added). The parties agreed that the provision prohibits taxpayers only from "directly" passing on the cost of the tax, which occurs "only when" the cost of the tax "is imposed on the customer by means of a 'separate fee, surcharge, or line-item'" stated on a customer invoice or the like. *Id.* Plaintiffs took the position that, so construed, the pass-through provision is an unconstitutional speech ban that bars their members from identifying the fact and magnitude of the tax increase in communications to customers.

1

The Court subsequently dismissed the First Amendment claim as moot (Dkt. 98), but the Fourth Circuit reversed and remanded (90 F.4th 679). At oral argument, the judges of the Fourth Circuit expressed uncertainty as to whether they could rely on the parties' stipulation concerning the meaning of the pass-through provision; they also were unclear whether the pass-through provision is best understood as a speech ban or a price-control regulation. *See generally* CA4 Oral Arg. Tr. 1:40-8:50. Rather than interpret the statute as a matter of law in the first instance on appeal, the Fourth Circuit remanded to this Court for it to "decide whether the pass-through provision restrains speech and, if so, whether it passes constitutional muster." 90 F.4th at 688-689.

Plaintiffs (like the State) continue to adhere to the joint stipulation concerning the meaning of Tax Gen. § 7.5-102(c). Below, we explain why the joint stipulation reflects the best understanding of the statutory language as a matter of Maryland law. In light of the reasoning below, the Court should hold that the pass-through provision is a speech ban and declare it facially invalid under the First Amendment.

## ARGUMENT

The pass-through provision states that a taxpayer "may not directly pass on the cost of the tax imposed under this section to a customer . . . by means of a separate fee, surcharge, or line-item." Tax Gen. § 7.5-102(c). The meaning of those words, and their implementation and enforcement by the Comptroller, is a question of Maryland state law. In Maryland courts, as in federal courts, the "starting point in the interpretation of any statute is with the plain language of the statute itself." *Thanos v. State*, 632 A.2d 768, 773 (Md. 1993). As we have argued (*e.g.*, Dkt. 31, at 56), the plain language of Tax-Gen. § 7.5-102(c) confirms that the provision regulates speech rather than conduct. None of the concerns raised at the appellate oral argument suggest otherwise.

JA055

**1.** We begin with the definitions of the terms used. "When searching for the meaning of a statutory word" or phrase, Maryland courts "turn first to recognized dictionaries." *Davis v. State*, 255 A.3d 56, 70 (Md. 2021). Contemporary dictionary definitions of the key statutory words confirm our reading of the law.

Take first the meaning of "pass on." When used with the word "on," the word "pass" means "to transfer from one person to another." *Pass*, Webster's Third New International Dictionary 1650 (2002 ed.) (defining "pass" in the sense of "passed it on"). In this way, the phrase "pass on" has a similar meaning to the phrases "pass through" or "pass along," which are generally understood as referring to a seller "charg[ing] to the buyer" the added cost of an increase in the price of an input. *Pass-through*, Black's Law Dictionary (11th ed. 2019). In light of these definitions, the words "pass on the cost of the tax imposed" appearing in Tax Gen. § 7.5-102(c) means taxpayers charging to their customers the cost of the Maryland digital advertising tax.

To pass on "directly" means to do so "[i]n a straightforward manner." *Directly*, Black's Law Dictionary (11th ed. 2019). The parties agree that the word has a specific meaning in Tax Gen. § 7.5-102(c), which draws from the words surrounding it: To pass on "directly" means to pass on "by means of a separate fee, surcharge, or line-item." That makes sense because the statute does not regulate the "passing on" of the tax taken alone, but rather only the passing on of the tax "by means of a separate fee, surcharge, or line-item." The plain-language definition of a "fee" is a "charge or payment for labor or services." *Fee*, Black's Law Dictionary (19th ed. 2019); *accord Fee*, Webster's Third New International Dictionary 833 (2002 ed.) (defining "fee" in the relevant sense as "a fixed charge"). And a "separate" fee is a charge that is "set apart" from other fees or charges.

JA056

*Separate*, Webster's Third New International Dictionary 2069 (2002 ed.) (defining "separate" to mean "set or kept apart").

The word "surcharge" bears a similar meaning—it is "a charge in excess of the usual or normal amount," such as "an additional tax, cost, or impost." *Surcharge*, Webster's Third New International Dictionary 2299 (2002 ed.); *accord Surcharge*, Black's Law Dictionary (19th ed. 2019) (defining a "surcharge" in the relevant sense as an "additional tax, charge or cost"). In ordinary experience, a surcharge is likewise set apart and stated separately from the normal fee on top of which it is charged.

And a "line-item" is "a single entry or notation to which a particular dollar amount is attached," typically on "a financial statement." *Line item*, Black's Law Dictionary (19th ed. 2019); *accord Item*, Webster's Third New International Dictionary 1203 (2002 ed.) (defining "item" in the sense of "one of a series of separate listings . . . given in a statement of charges").

**2.** Putting these definitions together yields a straightforward meaning: The pass-through provision forbids taxpayers from passing on the cost of the Maryland digital advertising tax to their consumers "by means of" a separately-stated charge, including on a financial statement, identifying the fact and magnitude of any price increase that is attributable to the tax. A communication that does *not* include a separate fee, surcharge, or line-item calling out the fact and magnitude of the Maryland digital advertising tax is permissible; but one that includes such additional information—one that expressly attributes rising prices to Maryland tax policy—is a violation of the statute.

Under *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017), the pass-through provision is thus plainly a speech regulation. The Supreme Court there held that a law that "tells merchants nothing about the amount they are allowed to collect," but

JA057

instead regulates "how sellers may communicate their prices," is a speech regulation. *Id.* at 47. The law at issue in *Expressions Hair Design* required vendors who wished to employ differential pricing for credit card and cash users to do so only by offering a "discount for the use of cash." *Id.* at 40. The Court held that the law did not regulate what sellers "could collect" because it permitted differential pricing. *Id.* at 47. The law regulated only how the seller "convey[ed] that price" in communications to customers. *Id.*

Just so here. The pass-through provision does not prevent a company that sells digital advertising from increasing its prices as a general matter. All that it prohibits is increasing prices *by means of* a separate fee, surcharge, or line-item—that is, by means of customer communications that identify the fact and magnitude of the tax and thereby attribute rising prices to Maryland lawmakers. Under the commonsense logic of *Expressions Hair Design*, that is a regulation of speech. *See also BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008) (a law that does not prohibit "raising prices to account for the new tax" and bars a seller only from "saying why it has raised prices" is one that "regulates speech, not conduct").

**3.** At oral argument, the judges of Fourth Circuit inquired whether the pass-through provision operates effectively as a regulation of pricing conduct rather than speech by forbidding taxpayers from accounting for the tax with line-items altogether, even on internal documents. The answer is *no*.

The provision here forbids "directly" passing on the cost of the tax "*to a customer . . . by means of* a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c) (emphasis added). The cost of the tax is "directly" passed on "to a customer . . . by means of" a line-item or separate fee only if the line-item or separate fee is shared in a customer-facing communication. As a practical matter, it would be impossible for a company to pay—much

less "directly" pass on—a tax without somehow identifying it on internal accounting documents. But if Maryland lawmakers had meant to reach such purely internal accounting, they presumably would have drafted Tax-Gen. § 7.5-102(c) to say simply that taxpayers "may not pass on the cost of the tax imposed under this section." Reading the pass-through provision to accomplish that result renders much of the text—including the words "directly" and "by means of a separate fee, surcharge, or line-item"—surplusage. In Maryland, as elsewhere, court must read "statute[s] as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Johnson v. State*, 225 A.3d 44, 50 (Md. 2020). That basic principle reinforces that Tax-Gen. § 7.5-102(c) forbids the *statement* of the tax as "a separate fee, surcharge, or line-item" in communications "to a customer"—communication rather than conduct.

**4.** Finally, the judges of the Fourth Circuit inquired at the oral argument whether Tax-Gen. § 7.5-102(c) is best read to forbid only *misleading* statements to customers on invoices or other financial statements. The answer to that question also is *no*.

The pass-through provision is a categorical ban on *all* separate fees, surcharges, and line-items—it draws no distinction between truthful and misleading statements. To be sure, in operation, it bans misleading statements just as well as truthful ones. But that does not mean that the law has a legitimate sweep saving it from invalidation. A speech ban that fails strict scrutiny—one that is not narrowly tailored to serve a compelling governmental interest—is by definition facially invalid. *See generally, e.g., Republican Party of Minnesota v. White*, 536 U.S. 765 (2002).

Moreover, at no point in this litigation has the State ever asserted an interest in protecting consumers from misleading statements, nor does any such interest appear in the legislative history. If that had been the interest underlying the pass-through provision (as

6

distinct from lawmakers' interest in insulating themselves from political accountability), it would have been easy to tailor the provision to that purpose by forbidding only misleading line-items, surcharges, or fees. But it also would have been unnecessary, since misleading statements in commercial transactions are already banned by the Maryland Consumer Protection Act (Md. Com. Law § 13-303(2)) and Unfair or Deceptive Trade Practices Act (Md. Com. Law § 13-301(1)).

Nor is the pass-through provision narrowly tailored to prevent misleading statements on invoices in any event. It is fundamental that a regulation of speech "may only survive strict scrutiny if it is the 'least restrictive means' of achieving the interest it serves." *Soderberg v. Carrion*, 645 F. Supp. 3d 460, 489–90 (D. Md. 2022) (quoting *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989)). A speech ban sweeps "too broadly" and is "unconstitutionally overinclusive" when it "'unnecessarily circumscribes protected expression'" in excess of what is needed to achieve the compelling state objective invoked to justify it. *Id.* at 489 (quoting *Central Radio v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (in turn quoting *Republican Party of Minnesota*, 536 U.S. at 775).

That would be the case here, if avoiding misleading speech had ever been the interest asserted by either the Comptroller or lawmakers. The pass-through provision does not bar only misleading line-items; rather, it bars *all* line-items. In any event, a line-item identifying the amount of and reason for a surcharge is not misleading. *Cf. Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 541 (D. Md. 2019) ("[I]nclusion of [a] line-item charge . . . amounted only to a representation that Defendants assessed this fee as part of the . . . price—a representation that was, in fact, true."). And truthful line-items that attribute responsibility for rising prices to lawmakers is plainly protected speech. The provision thus

JA060

"infring[es] on speech that does not pose the danger" that the judges (but not the State) raised at oral argument. *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986). That is all the more so because, again, there is no evidence that misleading line-items occur with any frequency.

## CONCLUSION

Tax Gen. § 7.5-102(c) regulates taxpayer communications to customers concerning the fact and magnitude of price increases attributable to the Maryland digital advertising tax. It does not survive strict scrutiny and therefore must be struck down on its face as a violation of the First Amendment.

JA061

Dated: March 29, 2024                    Respectfully submitted,

                                         */s/ Michael B. Kimberly*

                                         Michael B. Kimberly (No. 19086)
                                         Stephen P. Kranz*
                                         Charles Seidell (No. 21830)
                                            *McDermott Will & Emery LLP*
                                            *500 North Capitol Street NW*
                                            *Washington, DC 20001*
                                            *mkimberly@mwe.com*
                                            *(202) 756-8000*

                                          *Attorneys for All Plaintiffs*

                                         Tara S. Morrissey*
                                         Jennifer B. Dickey*
                                            *U.S. Chamber Litigation Center*
                                            *1615 H Street NW*
                                            *Washington, DC 20062*
                                            *(202) 463-5337*

                                         *Attorneys for the Chamber of Commerce*
                                         *of the United States of America*

                                         *\* admitted pro hac vice*

JA062

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | * | |
| | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:21-cv-00410-LKG |
| | * | |
| BROOKE LIERMAN, | * | |
| *Defendant.* | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF
REGARDING THE INTERPRETATION
OF THE PASS-THROUGH PROVISION**

On March 29, 2024, the parties submitted supplemental briefing regarding the meaning of the pass-through provision in § 7.5-102(c) of the Tax-General Article of the Maryland Code.  In its opening brief, the State explained that it stood by the interpretation memorialized by the parties in a stipulation set forth in an April 4, 2022 joint status report. (ECF 115 at 1; ECF 68 at 1.)  For their part, in their supplemental briefing plaintiffs also stated that they "continue to adhere to the joint stipulation concerning the meaning of Tax. Gen. § 7.5-102(c)."  (ECF 116 at 2.)

Thus, to the extent that each parties' supplemental briefing reflects continued adherence to the interpretation set forth in the stipulation, no further response is necessary. Suffice it to say, however, that the State disagrees with plaintiffs' briefing to the extent it incorporates legal conclusions and argument.  Instead, the State continues to adhere to the

arguments presented in previous filings, including its supplemental brief in support of its motion to dismiss plaintiffs' First Amendment claim (ECF 71), its responsive supplemental brief in support of its motion to dismiss plaintiffs' First Amendment claim (ECF 72), its supplemental brief regarding commercial speech analysis (ECF 81), and its responsive supplemental brief regarding plaintiffs' facial challenge to the pass-through prohibition (ECF 86).

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich
_____
Julia Doyle
Federal Bar. No. 25300
Ryan R. Dietrich
Federal Bar No. 27945
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jdoyle@oag.state.md.us
(410) 576-7291
(410) 576-6955 (facsimile)

April 8, 2024                          Attorneys for Defendant

JA064

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

*Plaintiffs*,

v.

BROOKE E. LIERMAN,

*Defendant*.

No. 1:21-cv-410-LKG

---

**PLAINTIFFS' SUPPLEMENTAL RESPONSE BRIEF**
**ON THE MEANING OF THE PASS-THROUGH PROVISION**

Plaintiffs have shown repeatedly that the pass-through provision, Tax-Gen. § 7.5-102(c), regulates speech and not conduct. *See, e.g.*, Dkt. 116, at 2-5; Dkt. 31, at 56. And earlier in these proceedings, the parties stipulated that the provision does not prohibit taxpayers from "indirectly passing on the cost of the tax" by raising their prices as a general matter; it prohibits only the passing on of the cost "by means of a 'separate fee, surcharge, or line-item'" on a customer communication. Dkt. 68, at 1.

The Comptroller has since affirmed that she, like we, "continues to adhere to the interpretation of the pass-through provision as expressed" in the parties' joint stipulation. Dkt. 115, at 1-2. She has furnished the further explanation that the pass-through provision "(1) does not affect an entity's internal-facing deliberations or accounting regarding the amount to charge for its services, (2) does not impose any restriction on the amount that an entity may in fact charge, and in turn (3) does not prohibit an entity from factoring the estimated cost of the tax into the price that it ultimately charges its customers." *Id.* at 2. That confirms that the statute does only one thing: It regulates how taxpayers communicate

1

JA065

with their customers about the tax. Although the Comptroller urges that taxpayers may still "convey information about the tax . . . through other means" (Dkt. 115, at 3), the ability of taxpayers to express general disagreement with the tax or to note the existence of the tax in the abstract does not remedy the First Amendment violation.

The Comptroller also asserts that the pass-through provision "places no limitations or constraints on what the taxpayer can communicate about the tax," including "stating the amount of the digital ad tax." Dkt. 115, at 3-4 (quoting Dkt. 72, at 1). But by its own admission (Dkt. 68, at 1), that is simply wrong. The law forbids taxpayers from identifying the fact and amount of the digital ad tax as a separately stated fee on, or in, any communication with a customer.

We gave several concrete examples of exactly how the pass-through provision works, by censoring statements on a taxpayer's communications with its customers. *See* Dkt. 85, at 2-3. The Comptroller has never suggested that these examples would be permissible under the act, nor attempted to explain how such censorship might survive First Amendment review. As the Sixth Circuit has explained, moreover, a line-item or separate fee reflecting recoupment of a tax "is about announcing who bears political responsibility for [rising prices] and about doing so in the forum most likely to capture voters' attention: an invoice that displays a predictable consequence of the tax." *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008).

JA066

Dated: April 8, 2024                         Respectfully submitted,

                                             */s/ Michael B. Kimberly*

                                             Michael B. Kimberly (No. 19086)
                                             Stephen P. Kranz*
                                             Charles Seidell (No. 21830)
                                               *McDermott Will & Emery LLP*
                                               *500 North Capitol Street NW*
                                               *Washington, DC 20001*
                                               *mkimberly@mwe.com*
                                               *(202) 756-8000*

                                               *Attorneys for All Plaintiffs*

                                             Tara S. Morrissey*
                                             Jennifer B. Dickey*
                                               *U.S. Chamber Litigation Center*
                                               *1615 H Street NW*
                                               *Washington, DC 20062*
                                               *(202) 463-5337*

                                             *Attorneys for the Chamber of Commerce*
                                             *of the United States of America*

                                             *\* admitted pro hac vice*

JA067

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BROOKE LIERMAN, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 21-cv-00410-LKG

Dated:  July 3, 2024

**<u>MEMORANDUM OPINION</u>**

## I.   INTRODUCTION

The remaining claim in this case involves a First Amendment facial challenge to the State of Maryland's Digital Advertising Gross Revenues Tax Act, 2021 Md. Laws ch. 37, codified at Title 7.5 of the Tax-General Article (the "DATA"), which has been brought by several trade associations that have members who will be liable for the tax imposed by the DATA.  *See* ECF No. 25.[1]  The Defendant, Brooke Lierman, the Comptroller for the State of Maryland, has moved to dismiss this claim, pursuant to Fed. R. Civ. P. 12(b)(6), upon the ground that Plaintiffs have failed to allege facts to show that they can prevail on their First Amendment facial challenge to the DATA's Pass-Through Prohibition.  *See* ECF Nos. 29, 29-1; *see also* ECF Nos. 71, 72, 81, 86, 115 and 117.  The Plaintiffs have also moved for summary judgment in their favor on this claim, pursuant to Fed. R. Civ. P. 56.  ECF Nos. 31, 31-1; *see also* ECF Nos. 70, 73, 82, 85, 116, 118.

---

[1] On March 30, 2022, the Court dismissed Counts I, II and III of the amended complaint for lack of subject-matter jurisdiction.  ECF No. 67.  On April 4, 2022, Plaintiffs withdrew their Commerce Clause Claim in Count IV of the amended complaint.  *See* ECF No. 68 at 1.  On December 2, 2022, the Court dismissed the First Amendment Claim in Count IV of the amended complaint on mootness grounds.  ECF No. 98.  On January 10, 2024, the United States Court of Appeals for the Fourth Circuit upheld the dismissal of Counts I, II and III of the amended complaint, reversed the Court's decision to dismiss Count IV of the amended complaint and remanded the Plaintiffs' First Amendment claim for further consideration by the Court.  ECF No. 106.

The Court has previously held several hearings on this issue.  ECF Nos. 77, 96.  No additional hearing is necessary to resolve these motions.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons set forth below, the Court: (1) **GRANTS** Defendant's motion to dismiss as to Count IV of the amended complaint; (2) **DENIES** Plaintiffs' motion for summary judgment as to Count IV of the amended complaint; and (3) **DISMISSES** this matter.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.   Factual Background

The remaining claim in this case involves a First Amendment facial challenge to the "Pass-Through Prohibition" contained in the State of Maryland's Digital Advertising Gross Revenues Tax Act, brought by the Chamber of Commerce of the United States of America, NetChoice and the Computer & Communications Industry Association.  *See generally* ECF No. 25, ¶¶ 94-96.  Plaintiffs seek a declaratory judgment declaring that the Pass-Through Prohibition violates the First Amendment and is, thus, unconstitutional, and to enjoin Defendant from enforcing the DATA's Pass-Through Prohibition.  ECF No. 25 at Prayer for Relief.

<u>The Maryland Digital Advertising Gross Revenues Tax Act</u>

As background, the DATA imposes a charge on a digital advertising service provider's annual gross revenues derived from digital advertising services provided in the State of Maryland, if the service provider has at least $100 million in global annual gross revenues.  *See* Md. Code Ann., Tax-Gen. §§ 7.5-102 to -103.  Under the DATA, "'[d]igital advertising services include[] advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services."  *Id*. at § 7.5-101(e)(1).

The tax rate under the DATA is graduated in increments of 2.5%, from 2.5% to 10%, based upon the global annual gross revenues of the business.  *See* Md. Code Ann., Tax-Gen. § 7.5-103.  In this regard, the DATA provides that the "assessable base" is the business's "annual gross revenues derived from digital advertising services in the State [of Maryland]."  *See* Md. Code Ann., Tax-Gen. § 7.5-101(c).  The statute also provides that the assessable base is

---

[2] The facts recited in this memorandum opinion are taken from the amended complaint, and the parties' supplemental briefs.  ECF Nos. 25, 73, 85, 115 and 116.

determined by using an apportionment fraction, based upon the annual gross revenues of the business derived from digital advertising services in Maryland (the numerator) and in the United States (the denominator). *Id*. at § 7.5-102(b)(1). In addition, the DATA requires that "[t]he Comptroller . . . adopt regulations that determine the state from which revenues from digital advertising services are derived." *Id*. at § 7.5-102(b)(2).

In 2021, the Maryland General Assembly adopted certain amendments to the DATA, which: (1) exclude advertising services on digital interfaces owned or operated by a broadcast entity, or news media entity and (2) prohibit a covered taxpayer from directly passing on the cost of the digital ad tax to a purchaser of digital advertising services. *See* 2021 Md. Laws ch. 669, § 1 (S.B. 787) (amending Md. Code Ann., Tax-Gen. §§ 7.5-101 to -102). Relevant to the pending motions, the so-called "Pass-Through Prohibition" in the DATA provides that:

> A person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item.

*See* Md. Code Ann., Tax-Gen. § 7.5-102(c). On April 4, 2022, the parties entered into a stipulation in which they agree that:

> Tax-General § 7.5-102(c) does not prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax imposed under Tax-General § 7.5-102 by factoring such cost into its customer pricing. The cost of the tax is passed on directly only when it is imposed on the customer by means of a "separate fee, surcharge, or line-item."

ECF No. 68 at 1.

The proceeds collected *via* the DATA's charge are distributed to the Blueprint for Maryland's Future Fund. *See* Md. Code Ann., Tax-Gen. § 2-4A-02. This fund is used to pay for a comprehensive package of improvements that are intended to "transform Maryland's education system to world-class student achievement levels." *See* Md. Code Ann., Educ. § 1-301(a). "Proceeds deposited in the Blueprint for Maryland's Future Fund are kept segregated from the Maryland general fund and earmarked for specific educational purposes[.]" ECF No. 25 at 11. The Defendant represents to the Court that the State of Maryland expects the DATA to generate

as much as $250 million in annual revenues to fund the Blueprint for Maryland's Future Fund. ECF No. 29-1 at 25.

<u>The Plaintiffs' First Amendment Claim</u>

In Count IV of the amended complaint, Plaintiffs allege that the DATA's Pass-Through Prohibition violates the First Amendment, because it is a content-based restriction on speech. *See* ECF No. 25, ¶ 96(a); *see also* ECF Nos. 70, 73, 82, 85. In this regard, Plaintiffs acknowledge that, "if the pass-through prohibition is interpreted to prohibit the targets of the [DATA] from passing on the charge to downstream market participants at all, it regulates conduct." ECF No. 25, ¶ 95. [3] But Plaintiffs allege that, "[i]f the [P]ass-[T]hrough [P]rohibition is interpreted to prohibit companies from including a separate fee, surcharge, or line-item on bills, invoices, receipts, or the like to pass on the Act's charge, it is also a content-based regulation of speech." ECF No. 25, ¶ 96.

In this regard, Plaintiffs allege that including a separate fee, surcharge, or line-item regarding the charge imposed by the DATA on an invoice or bill is "core political speech concerning who bears responsibility for the charge . . . and ultimately the burden of the charge[.]" ECF No. 25, ¶ 96(a). Given this, Plaintiffs also allege that "[f]orbidding the direct payers of the charge from including a separate fee, surcharge, or line-item—while at the same time permitting them to raise prices to accomplish the same practical effect—is a suppression of speech that insulates lawmakers from responsibility for the Act." *Id.* And so, Plaintiffs contend that the DATA's Pass-Through Prohibition "is not narrowly tailored to serve a compelling state interest." *Id.*

Alternatively, Plaintiffs contend that, if "the inclusion on an invoice of a separate fee, surcharge, or line-item to recoup the [DATA']s charge" is not "core political speech," it is "commercial speech." ECF No. 25, ¶ 96(b). And so, Plaintiffs further contend that the Pass-Through Prohibition violates the First Amendment, because it: (1) "does not regulate misleading or fraudulent speech[;]" (2) "does not directly advance a substantial governmental interest[;]" and (3) "is more extensive than necessary to serve any conceivable interests that it might further." *Id.*

---

[3] In their supplemental briefs, Plaintiffs assert that a reading of the Pass-Through Prohibition to regulate conduct rather than speech is "no longer a tenable position," given the parties' stipulation. ECF No. 70 at 7; *see also* ECF No. 73 at 2-3.

To support their First Amendment facial challenge to the DATA's Pass-Through Prohibition, Plaintiffs have proffered the three hypothetical invoices shown below, which they argue would be prohibited under the DATA:

**ACME DIGITAL ADVERTISING**
**INVOICE – February 1, 2022**

January 2022 advertising services: **$900**
**Maryland Digital Advertising Tax recoupment fee: $100**
Total due: $1000

**SMITH & SONS DIGITAL ADVERTISING CO.**
**INVOICE – February 1, 2022**

Total due for January 2022 advertising services: $1000*
**\* Includes a 10% surcharge for the Maryland Digital Advertising Tax, which will be remitted to Comptroller of Maryland pursuant to Md. Tax-Gen. § 7.5-102.**

**DIGITAL MARKETING OF AMERICA**
**INVOICE – February 1, 2022**

Advertising services, 1/1/22 thru 1/31/22: $1000
**Please note: Your total includes a $100 fee to pay the Maryland Digital Advertising Tax.**

ECF Nos. 73 at 3; 85 at 3 (emphasis supplied).  Plaintiffs argue that the text shown in bold in these hypothetical invoices would not be allowed under the Pass-Through Prohibition, and that these hypothetical invoices show that the law violates the First Amendment by restricting content-based speech about the cost of the tax.  ECF Nos. 73, 85.  And so, Plaintiffs request that the Court declare the Pass-Through Prohibition unconstitutional and enjoin the Defendant from enforcing the Pass-Through Prohibition.  ECF No. 25 at Prayer for Relief.

<u>The Litigation History And The Fourth Circuit's Decision</u>

The Court has previously issued two memorandum opinions and orders related to Plaintiffs' claims in this matter.  First, on March 30, 2022, the Court issued a memorandum opinion and order dismissing Counts I, II and III of the amended complaint, which relate to Plaintiffs' Internet Tax Freedom Act, Commerce Clause and Due Process Clause claims (the "March 30, 2022, Decision").  ECF No. 67.  On December 2, 2022, the Court issued a memorandum opinion and order dismissing-as-moot Plaintiffs' First Amendment claim set forth

in Count IV of the amended complaint, without prejudice (the "December 2, 2022, Decision"). ECF No. 98.

Plaintiffs subsequently appealed the Court's March 30, 2022, and December 2, 2022, Decisions to the United States Court of Appeals for the Fourth Circuit. ECF Nos. 102, 103, 104. On January 10, 2024, the Fourth Circuit issued an opinion affirming-in-part, and vacating-in-part, the judgments of the Court and remanding the case for further proceedings. ECF No. 106-1.

Specifically, the Fourth Circuit held that the Court erred in dismissing Plaintiffs' First Amendment facial challenge to the DATA's Pass-Through Prohibition on mootness grounds, because this claim is "unquestionably live" since the Maryland Supreme Court has vacated the judgment of the Circuit Court for Anne Arundel County declaring the DATA unconstitutional. ECF No. 106-1 at 15. Given this, the Fourth Circuit directed the Court to decide whether the Pass-Through Prohibition restrains speech, and if so, whether it passes constitutional muster. *Id.*

In this regard, the Fourth Circuit held that a First Amendment facial challenge "requires proving that 'no set of circumstances exists under which the Act would be valid[.]'" *Id.* (quoting *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020)). The Fourth Circuit also observed that the "sorts of circumstances" contemplated by a facial challenge "are best considered by the district court with the benefit of further fact-finding potentially." *Id.* (citing *GenOn Mid-Atlantic, LLC v. Montgomery County, MD*, 650 F.3d 1021, 1026 (4th Cir. 2011); *Freed v. Thomas*, 976 F.3d 729, 732 (6th Cir. 2020)). Lastly, the Fourth Circuit observed that "[a] facial challenge to a statute's constitutionality presents a 'high bar[],' and 'courts must typically take care 'not to . . . speculate about hypothetical or imaginary cases.'" *Id.* (quoting *Miselis*, 972 F.3d at 530; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). And so, the Fourth Circuit remanded this matter for the Court "to determine whether the [DATA] is unconstitutional in all circumstances." *Id.*

**B.  Relevant Procedural Background**

Plaintiffs commenced this matter on February 18, 2021, and they subsequently amended the complaint on April 30, 2021. ECF Nos. 1, 25. On March 30, 2022, the Court issued a memorandum opinion and order: (1) granting-in-part and denying-in-part the Defendant's motion to dismiss the amended complaint; (2) denying-as-moot the Plaintiffs' motion for

JA073

summary judgment; and (3) dismissing Counts I, II and III of the amended complaint.  ECF No. 67.

On December 2, 2022, the Court issued a memorandum opinion and order: (1) denying-as-moot Defendant's motion to dismiss as to Count IV of the amended complaint; (2) denying-as-moot Plaintiffs' motion for summary judgment as to Count IV of the amended complaint; and (3) dismissing Count IV of the amended complaint without prejudice.

On December 13, 2022, Plaintiffs appealed the Court's March 30, 2022, and December 2, 2022, Decisions.  ECF Nos. 102, 103, 104.  On January 10, 2024, the Fourth Circuit issued an opinion affirming-in-part, and vacating-in-part the Court's March 30, 2022, and December 2, 2022, Decisions, and remanding the case for further proceedings with regards to Count IV of the amended complaint.  ECF No. 106-1.

On March 29, 2024, the parties filed supplemental briefs regarding the meaning of the Pass-Through Prohibition.  ECF Nos. 115, 116.  On April 8, 2024, the parties filed supplemental responsive briefs.  ECF Nos. 117, 118.

These matters having been fully briefed, the Court resolves the pending motions.

## III.    LEGAL STANDARDS

### A.    Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when "the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citations omitted).  But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ."  *Nemet Chevrolet*, 591 F.3d at 255.  And so, the Court should grant a motion to dismiss for failure to

state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *GE Inv. Private Placement Partners II, L.P. v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989)).

### B.     Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56, the Court may grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute is "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.*  When considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in that party's favor.  *Id.* at 255 (citation omitted).  But, the Court may rely only on facts supported in the record.  *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  And so, the Court may not rely upon unsubstantiated assertions that are provided in the pleadings.  *See id.*

### C.  First Amendment Facial Challenges

The Supreme Court has held that "[t]he First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also* U.S. Const., amend. I.  And so, the Government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed*, 576 U.S. at 163.[4]

---

[4] Courts have long recognized a distinction between so-called "content-based" and "commercial" speech. A government regulation of speech is considered "content based," when "the law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 576 U.S. at 171.  By comparison, commercial speech is "expression related solely to the economic interests of the speaker and its audience."  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980).  And so, the Government "must assert a substantial interest to be achieved by restrictions on commercial speech" and "the regulatory technique must be in proportion to that interest."  *Id.*

The validity of a statute can be challenged under the First Amendment upon two grounds – facial and as-applied. *See Greater Balt. Cent. for Pregnancy Concerns, Inc. v. Mayor and City Council Balt.*, 721 F.3d 264, 282 (4th Cir. 2013). The Supreme Court and the Fourth Circuit have both held that First Amendment facial challenges are disfavored. *Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at *8, 17 (U.S. July 1, 2024); *see also United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Notably, the Fourth Circuit has held that "facial challenges 'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law that is broader than is required by the precise facts to which it is to be applied.' . . . [r]elatedly, facial challenges 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Miselis*, 972 F.3d at 530 (citing *Wash. State Grange*, 552 U.S. at 451).

When bringing a facial challenge to a statute, a plaintiff may ordinarily sustain its burden by demonstrating "that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep." *Miselis*, 972 F.3d at 530 (internal citations omitted). Under this test, a facial challenge must fail where the statute has a plainly legitimate sweep. *Wash. State Grange*, 552 U.S. at 449 ("Members of the Court . . . all agree that a facial challenge must fail where the statute has a plainly legitimate sweep[.]").[5]

But, "[w]hen a facial suit is based on the First Amendment . . . a different standard applies." *Moody*, 2024 WL 3237685, at *8. In this regard, the Supreme Court has recently held that:

> [A] plaintiff cannot succeed on a facial challenge unless he "establish[es] that no set of circumstances exists under which the [law] would be valid," or he shows that the law lacks a "plainly legitimate sweep." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Washington State Grange*, 552 U. S., at 449. In First Amendment cases, however, this Court has lowered that very high bar. To

---

[5] While courts have not expressly defined what it means to have "a plainly legitimate sweep" within this context, the Fourth Circuit has held that the Anti-Riot Act has a plainly legitimate sweep, because this federal criminal statute "validly proscribes" efforts to engage in unprotected speech, such as instigating a riot, and unprotected conduct, such as participating in a riot. *See Miselis*, 972 F.3d at 541 (But also observing that the statute "sweeps up a substantial amount of protected activity.").

JA076

> "provide[] breathing room for free expression," we have substituted a
> less demanding though still rigorous standard. *United States v.
> Hansen*, 599 U. S. 762, 769 (2023). The question is whether "a
> substantial number of [the law's] applications are unconstitutional,
> judged in relation to the statute's plainly legitimate sweep." *Americans
> for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021); *see
> Hansen*, 599 U.S., at 770 (likewise asking whether the law "prohibits a
> substantial amount of protected speech relative to its plainly legitimate
> sweep"). So in this singular context, even a law with "a plainly
> legitimate sweep" may be struck down in its entirety. But that is so
> only if the law's unconstitutional applications substantially outweigh
> its constitutional ones.

*Id.*; *see also Miselis*, 972 F.3d at 530 (recognizing that "the fear of chilling protected expression 'has led courts to entertain facial challenges based merely on hypothetical applications of the law to nonpartie[s,]'" and holding that "a statute 'may be invalidated as overbroad' as long as 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'") (internal citations omitted).

When considering a First Amendment facial challenge, "[t]he proper analysis begins with an assessment of the state laws' scope." *Moody*, 2024 WL 3237685, at *9. And so, before the Court "can do anything else with these facial challenges, it must 'determine what [the law] covers.'" *Id.* at *9 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). "The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.*; *see also Miselis*, 972 F.3d at 531 (citing *United States v. Williams*, 553 U.S. 285, 297 (2008)) ("We must then determine whether, so construed, the statute 'criminalizes a substantial amount of protected expressive activity.'").

Also relevant to this dispute, several courts have considered whether certain statutes that prohibit imposing a surcharge, or separately stating a tax on a bill, regulate speech. Notably, the Supreme Court held in *Expressions Hair Design v. Schneiderman* that a state statute providing that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means" regulated speech. 581 U.S. 37, 41 (2017) (quoting N.Y. Gen. Bus. Law Ann. § 518 (2012)). In reaching that conclusion, the Supreme Court observed that:

> [The statute] is not like a typical price regulation. Such a regulation—
> for example, a law requiring all New York delis to charge $10 for their
> sandwiches—would simply regulate the amount that a store could

JA077

> collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

*Id.* at 47 (internal quotations omitted) (quoting *Rumsfeld v. F. for Acad. and Institutional. Rts., Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))). But, the Supreme Court held that that:

> [This statute] is different. The law tells merchants nothing about the amount they are allowed to collect from a cash or credit card payer. Sellers are free to charge $10 for cash and $9.70, $10, $10.30, or any other amount for credit. What the law does regulate is how sellers may communicate their prices. A merchant who wants to charge $10 for cash and $10.30 for credit may not convey that price any way he pleases. He is not free to say "$10, with a 3% credit card surcharge" or "$10, plus $0.30 for credit" because both of those displays identify a single sticker price—$10—that is less than the amount credit card users will be charged. Instead, if the merchant wishes to post a single sticker price, he must display $10.30 as his sticker price.

*Id.* at 47.

The United States Court of Appeals for the Sixth Circuit has also held in *BellSouth Telecomms., Inc. v. Farris* that a Kentucky law, providing that "[t]he provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser," violated the First Amendment, to the extent that the law prohibited telecommunication providers from identifying a tax on consumers' bills.  542 F.3d 499, 501, 504 (6th Cir. 2008).  The Sixth Circuit concluded, however, that the portion of this law that prohibited telecommunication providers from collecting a tax directly from consumers, referred to "non-expressive conduct" and, therefore, did not implicate or violate the First Amendment.  *Id.* at 510.

### D. Statutory Construction

Lastly, the Fourth Circuit has held that the first step when interpreting a statute "'is to determine whether the language at issue has a plain and unambiguous meaning' by looking to

'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Orquera v. Ashcroft*, 357 F.3d 413, 418 (4th Cir. 2003) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997)); *see also Am. Acad. Of Pediatrics v. Food & Drug Admin.*, 379 F.Supp.3d 461, 485 (D. Md. 2019) (explaining that to interpret a statute, the Court first looks at the language in the statute and determines whether it has a plain and unambiguous meaning) (quotations omitted).  In this regard, the Supreme Court has held that the "cardinal rule" of plain meaning review is "that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff*, 507 U.S. 511, 515 (1993) (citing *King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991)).  And so, the Court must consider the context in which the statutory words are used, because the Court does not construe statutory phrases in isolation. *See Ayes v. U.S. Dep't of Veterans Affs.*, 473 F.3d 104, 108 (4th Cir. 2006); *see also Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 559 U.S. 280, 290 (2010) (explaining that "[c]ourts have a duty to construe statutes, not isolated provisions.").

## IV.   LEGAL ANALYSIS

The Defendant has moved to dismiss Plaintiffs' First Amendment facial challenge to the DATA's Pass-Through Prohibition, upon the grounds that: (1) the Pass-Through Prohibition only regulates conduct; (2) to the extent that the Pass-Through Prohibition is construed to regulate speech, Plaintiffs cannot show that no set of circumstances exists under which the law would be valid, that the law lacks any plainly legitimate sweep, or that the Pass-Through Prohibition is overbroad, to prevail on their First Amendment facial challenge; (3) the Pass-Through Prohibition is not subject to strict scrutiny, because it does not restrict content-based speech; and (4) the Pass-Through Prohibition also satisfies intermediate scrutiny, if construed to regulate commercial speech.  ECF Nos. 29, 71, 72, 81, 86.  And so, Defendant requests that the Court dismiss Plaintiffs' First Amendment claim in Count IV of the amended complaint.  ECF No. 29.

Plaintiffs counter that the Court should not dismiss their First Amendment claim, and that they are entitled to summary judgment in their favor on this claim, because: (1) the Pass-Through Prohibition regulates content-based speech and no set of circumstances exists under which the Pass-Through Prohibition would be valid and (2) if construed to regulate commercial speech, the Pass-Through Prohibition also fails to satisfy intermediate scrutiny.  ECF Nos. 31, 70, 73, 82, 85.

JA079

And so, Plaintiffs request that the Court deny Defendant's motion to dismiss and grant their motion for summary judgment as to Count IV of the amended complaint.  ECF No. 31.

For the reasons set forth below, the plain language of the DATA's Pass-Through Prohibition shows that this law regulates conduct, to the extent that the Pass-Through Prohibition prohibits "directly passing on the cost of the tax imposed by [the DATA]."  But, the Court reads the Pass-Through Prohibition to regulate protected speech, to the extent that the statute prohibits directly passing the cost of the tax, "by means of a separate fee, surcharge, or line-item."

Plaintiffs have not shown, however, that the Pass-Through Prohibition lacks a "plainly legitimate sweep," or that a substantial number of the statute's applications are unconstitutional, judged in relation to the Pass-Through Prohibition's plainly legitimate sweep, to prevail on their First Amendment facial challenge.  And so, the Court: (1) **GRANTS** Defendant's motion to dismiss Plaintiffs' First Amendment claim in Count IV of the amended complaint; (2) **DENIES** Plaintiffs' motion for summary judgment on this claim; and (3) **DISMISSES** this matter.

### A.  The Court Construes The Pass-Through Prohibition To Prohibit Direct Passage Of The Cost Of The Tax Onto The Customer, By Way Of A "Separate Fee, Surcharge, Or Line-Item"

As an initial matter, the Court must begin its analysis of Plaintiffs' First Amendment facial challenge to the DATA's Pass-Through Prohibition by construing the challenged statute. *Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at \*9 (U.S. July 1, 2024); *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (citing *United States v. Williams*, 553 U.S. 285, 293 (2008)).  The Court reads the plain language of the DATA's Pass-Through Prohibition to prohibit a taxpayer from directly passing on the cost of the tax imposed by that statute by means of a "separate fee, surcharge, or line-item" contained in an invoice or bill.

The relevant text of the DATA provides that:

> A person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item.

Md. Code Ann., Tax-Gen. § 7.5-102(c).  The Court finds this language to be plain and unambiguous.  *Orquera v. Ashcroft*, 357 F.3d 413, 418 (4th Cir. 2003); *Am. Acad. Of Pediatrics v. Food & Drug Admin.*, 379 F.Supp.3d 461, 485 (D. Md. 2019).

The Court reads the statute's use of the word "directly," within the context of the requirement that a taxpayer "may not directly pass on the cost of the tax imposed by [the DATA]," to mean that a taxpayer cannot pass on the cost of the tax "in a straightforward manner." *Directly*, Black's Law Dictionary (11th ed. 2019). The Court also reads the word "pass" in this statute to mean "to transfer or be transferred." *Pass*, Black's Law Dictionary (11th ed. 2019). And so, the Court reads the Pass-Through Prohibition to prohibit a taxpayer from directly passing on or transferring the cost of the tax imposed by the DATA to a customer. Md. Code Ann., Tax-Gen. § 7.5-102(c).

The Court also reads the DATA's Pass-Through Prohibition to specify the manner in which the cost of the tax imposed by the statute cannot be directly passed on to a customer. In this regard, the statute makes clear that a taxpayer cannot directly pass on the tax, "to a customer . . . by means of a separate fee, surcharge, or line-item." Md. Code Ann., Tax-Gen. § 7.5-102(c). The Court reads the phrase "by means of" in this statute to mean "through the use of." *By Means Of*, MerriamWebster.com, https://www.merriam-webster.com/dictionary/by%20means%20of (last visited July 3, 2024); *see also Means*, Black's Law Dictionary (11th ed. 2019) (defining "means" to be "an instrument" or "something that helps to attain an end"). The Court also reads the word "separate" to mean "set or kept apart" and the words "fee," "surcharge" and "line-item" to mean to the costs or charges that are contained in, or included on a financial statement, bill, or invoice. *See Separate*, MerriamWebster.com, https://www.merriam-webster.com/dictionary/separate (last visited July 3, 2024); *see also Fee*, Black's Law Dictionary (19th ed. 2019) (defining "fee" as a "charge or payment for labor or services"); *Surcharge*, Black's Law Dictionary (19th ed. 2019) (defining "surcharge" as an "additional tax, charge or cost"); *Line-Item*, Black's Law Dictionary (19th ed. 2019) (defining "line-item" as "a single entry or notation to which a particular dollar amount is attached," typically on "a financial statement").

The Court's reading of the Pass-Through Prohibition is consistent with the parties' reading of this statute. Notably, the parties in this matter stipulate that:

> [The DATA's Pass Through-Prohibition] does not prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax imposed under Tax-General § 7.5-102 by factoring such cost into its customer pricing. The cost of the tax is passed on directly only when it is imposed on the customer by means of a "separate fee, surcharge, or line-item."

ECF No. 68.  And so, the Court reads the DATA's Pass-Through Prohibition to prohibit a taxpayer from directly passing on the cost of the DATA's tax to its customers, by stating the amount of the cost of the tax in a "separate fee, surcharge, or line-item" contained in a customer bill or invoice.

### B.  The Statute's Prohibition Of Passing On The Cost Of The Tax "By Means Of A Separate Fee, Surcharge, Or Line-Item" Restricts Speech

Having construed the language of the Pass-Through Prohibition to prohibit a taxpayer from directly passing on the cost of the DATA's tax to its customers, by stating the amount of the cost of the tax in "separate fee, surcharge, or line-item" in a customer bill or invoice, the Court must next determine whether this statute restrains speech.  ECF No. 106-1 at 15 ("The district court in the first instance should decide whether the pass-through provision restrains speech and, if so, whether it passes constitutional muster."); *see also United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020) (the Court must "determine whether, so construed, the statute 'criminalizes a substantial amount of protected expressive activity.'") (internal citation omitted). In this regard, both the Supreme Court and the United States Court of Appeals for the Sixth Circuit have considered whether statutes that are quite similar to the DATA's Pass-Through Prohibition restrain speech.  Notably, in *Expressions Hair Design v. Schneiderman*, the Supreme Court held that that a state statute which provided that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means" regulates speech, because the statute regulated how sellers may communicate their prices.  581 U.S. 37, 41 (2017) (quoting N.Y. Gen. Bus. Law Ann. § 518 (2012)).  In this regard, the Supreme Court found that the statute at issue in *Expressions Hair Design* regulated "how sellers may communicate their prices, . . . [so that a] merchant . . . may not convey that price any way he pleases."  *Id.* at 47.

The Sixth Circuit has similarly held that a Kentucky law, which provides that "[t]he provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser," violated the First Amendment, to the extent that the statute prohibited telecommunications providers from identifying a tax on consumers' bills.  *BellSouth*, 542 F.3d at 501, 504.  Notably, the Sixth Circuit found that the statute's requirement that the provider not "separately state the tax on the bill to the purchaser" violated the First Amendment, to the extent that this requirement prohibits the provider from identifying the tax on a consumer's bill.  *Id.*

JA082

But, the Sixth Circuit also found that the portion of this law that prohibited telecommunication providers from collecting the tax directly from their consumers regulated "non-expressive conduct" and, thus, did not implicate or violate the First Amendment. *Id.* at 510.

In this matter, the Court reads the DATA's Pass-Through Prohibition to regulate and restrain speech, to the extent that the statute prohibits passing on the DATA's tax "by means of a separate fee, surcharge or line-item." The Court observes as an initial matter that the Defendant persuasively argues that the statute's prohibition of directly passing on the cost of the DATA's tax regulates non-expressive conduct. Indeed, the DATA's Pass-Through Prohibition regulates the conduct of directly passing on the cost of the tax to consumers. *See BellSouth*, 542 F.3d at 511. And so, the portion of the Pass-Through Prohibition that prohibits a taxpayer from directly passing on the cost of the DATA's tax does not implicate or violate the First Amendment. *See id.* (determining that barring practice of direct-collection only regulates conduct).[6]

The statute's requirement that the cost of the DATA's tax cannot be directly passed on "by means of a separate fee, surcharge, or line-item" is, however, more problematic within the context of the First Amendment. As discussed above, the Court reads the Pass-Through Prohibition to prohibit a taxpayer from directly passing on the cost of the DATA's tax "by means of a separate fee, surcharge or line-item." Md. Code Ann., Tax-Gen. § 7.5-102(c). As Plaintiffs persuasively argue, this requirement restricts speech, because the Pass-Through Prohibition places restrictions on how a taxpayer can communicate to its customers about the tax. *Expressions Hair Design*, 581 U.S. at 47.

In other words, a taxpayer who is subject to the DATA's tax is not free to convey its prices for digital advertising services in any way that it pleases. *Id*. And so, the Court agrees with Plaintiffs that the Pass-Through Prohibition implicates the First Amendment, to the extent that this statute regulates *how* a taxpayer may communicate its prices to a customer. *Id*.

---

[6] To the extent that the Pass-Through Prohibition restricts protected speech, that speech can be best categorized as commercial speech, because any statement regarding the cost of the DATA's tax provided *via* "a separate fee, surcharge or line-item" is an "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980); *BellSouth*, 542 F.3d at 504 (acknowledging that the law at issue could be read to primarily regulate commercial speech that deals with the economic interests of the customers and taxpayers); *but see Bloom v. O'Brien*, 841 F. Supp. 277 (D. Minn. 1993) (noting that a prohibited line-item "may well be construed as a political statement about the law as well as a commercial statement about what is owed."). Notably, the Pass-Through Prohibition does not prohibit a taxpayer from expressing views about the tax, stating the fact of the tax, or explaining the effect of the tax on pricing.

**C.  The Plaintiffs Have Not Shown That The Statute Is Facially Unconstitutional**

While Plaintiffs have shown that the Pass-Through Prohibition restricts protected speech, to the extent that the statute prohibits directly passing on of the cost of the tax "by means of a separate fee, surcharge or line-item," Plaintiffs have not met their burden to show that "a substantial number of [the Pass-Through Prohibition's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at *8 (U.S. July 1, 2024); *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020).

To prevail on their First Amendment facial challenge to the DATA's Pass-Through Prohibition, Plaintiffs must show that "a substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Moody,* 2024 WL 3237685, at *8; *see also United States v. Hansen*, 599 U.S. 762, 770 (2023); *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021).  In this regard, the Supreme Court has recognized that:

> [Within] this singular context [of a First Amendment facial challenge], even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones.

*Moody*, 2024 WL 3237685, at *8; *see also Miselis*, 972 F.3d at 530 (recognizing that "the fear of chilling protected expression 'has led courts to entertain facial challenges based merely on hypothetical applications of the law to nonparties[,]'" and holding that "a statute 'may be invalidated as overbroad' as long as 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'") (internal citations omitted).

When considering Plaintiffs' First Amendment facial challenge in this case, the Court begins its analysis "with an assessment of the state laws' scope."  *Moody*, 2024 WL 3237685, at *9.  And so, as discussed above, the Court has interpreted the plain language of the Pass-Through Prohibition, to "determine what [the law] covers.'"  *Id*. (quoting *Hansen*, 599 U.S. at 770).

"The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest."  *Id*. at *9; *see also Miselis*, 972 F.3d at 531

("We must then determine whether, so construed, the statute 'criminalizes a substantial amount of protected expressive activity.'") (internal citation omitted).  And so, the Court turns to this step to resolve Plaintiffs' First Amendment claim here.

Applying these principles, the Court first observes that Plaintiffs argue without persuasion that the DATA's Pass-Through Prohibition lacks any plainly legitimate sweep.  As Defendant explains in her briefs, the DATA has a plainly legitimate sweep, because the State of Maryland unquestionably possesses the power to levy taxes.  ECF No. 72 at 14.[7]  Defendant also persuasively argues that the DATA advances the State's interest in exercising the power to levy taxes, so that the State can generate revenue to fund improvements to public education from the funds generated through the tax.  *Id.*  In this regard, it is undisputed that the proceeds collected *via* the DATA's tax are distributed to the Blueprint for Maryland's Future Fund, which is used to pay for a comprehensive package of improvements that are intended to "transform Maryland's education system to world-class student achievement levels."  ECF No. 29-1 at 7; *see also* Md. Code Ann., Tax-Gen. § 2-4A-02; Md. Code Ann., Educ. § 1-301(a).  The State of Maryland expects the DATA to generate as much as $250 million in annual revenues to fund the Blueprint for Maryland's Future Fund.  ECF No. 29-1 at 25.

The record before the Court also makes clear that Plaintiffs have not met their burden to show that a substantial number of the Pass-Through Prohibition's applications are unconstitutional, when judged in relation to the statute's plainly legitimate sweep for several reasons.  First, the degree of protected speech implicated by the DATA's Pass-Through Prohibition is not substantial.  As discussed above, the portion of the statute that prohibits directly passing on the cost of the tax imposed by the DATA does not restrict speech.

The Court also observes that the record in this matter with regards to how the Pass-Through Prohibition would apply to Plaintiffs' members is not voluminous.  While Plaintiffs do put forward three hypothetical invoices, that they argue are among "countless examples" of how the statute as applied is unconstitutional, the record before the Court lacks precise facts about

---

[7] Plaintiffs' argument that they can prevail on their First Amendment facial challenge, because they have shown that the Pass-Through Prohibition restricts content-based speech is unpersuasive.  ECF No. 73 at 4. Plaintiffs must show that there are a substantial number of applications of the Pass-Through Prohibition that are unconstitutional, when judged in relation to its plainly legitimate sweep, to prevail on a First Amendment facial challenge to the statute.  *Moody*, 2024 WL 3237685, at *8; *Miselis*, 972 F.3d at 530.

how the law would actually apply to Plaintiffs' members.  ECF No. 73 at 3; ECF No. 72 at 5; ECF No. 86 at 6.

The Defendant has also shown that there are many applications of the Pass-Through Prohibition that are constitutional.  For example, the statute does not prohibit a taxpayer from expressing its views or opinions about the tax imposed by the DATA in an invoice or bill, or otherwise.  ECF No. 71 at 3 ("The [P]ass-[T]hrough [P]rohibition, as set forth in § 7.5-102(c) . . . does not purport to impose any restriction on what the taxpayer may say to the customer, or anyone else, about the tax cost or any other subject.").  Nor does the statute restrict or prohibit a taxpayer from communicating that an invoice or bill is for a higher amount, due to the imposition of the DATA's tax.  ECF No. 72 at 3 ("But, unlike statutes challenged in the cases on which plaintiffs rely, Maryland's statute does not prevent persons subject to the tax from conveying any information they might choose to communicate to a customer. So long as the taxpayer does not 'directly pass on the cost of the tax imposed . . . to a customer . . . by means of a separate fee, surcharge, or line-item,' Md. Code Ann., Tax-Gen. § 7.5-102(c), the statute places no limitations or constraints on what the taxpayer can communicate about the tax, whether it be stating the amount of digital ad tax or expressing any views the taxpayer might have about the tax.").

There is similarly no restriction on speech under the statute when a taxpayer does not directly pass on the tax cost to its customer.  *Id.*  A taxpayer can communicate the amount of the tax and the fact that the cost of the tax is factored into the amount charged to the customer to its customer.  *Id.*  In fact, the parties' stipulation regarding the Pass-Through Prohibition makes clear that the statute "does not prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax imposed under Tax-General § 7.5-102 by factoring such cost into its customer pricing."  ECF No. 68 at 1.

By comparison, the hypothetical invoices put forward by Plaintiffs do not show that a substantial number of the applications of the Pass-Through Prohibition are unconstitutional.  Plaintiffs argue that these hypothetical invoices would violate the DATA's Pass-Through Prohibition, because they contain either: (1) a line-item showing a DATA "recoupment fee," (2) a statement that the invoice includes a surcharge for the tax imposed by the DATA, or (3) a statement that the total includes a $100 fee to pay the cost of the tax imposed by the DATA.  ECF Nos. 73, 85. But, the fact that these invoices would violate the DATA and arguably restrict protected speech, alone, is not sufficient to show that a *substantial* number of the statute's

JA086

applications are unconstitutional.  The Court observes that Plaintiffs maintain that their hypothetical invoices are "among countless examples" of how the statute would be unconstitutional as applied.  ECF No. 73 at 3.  But the record before the Court, and the plain reading of the Pass-Through Prohibition, does not support Plaintiffs' argument.

Rather, as discussed above, the record before the Court and the text of the DATA's Pass-Through Prohibition make clear that there are many applications of this statute that would be constitutional and would not implicate the First Amendment.  At bottom, the statute's unconstitutional applications do not substantially outweigh its constitutional ones.  For this reason, Plaintiffs have not shown that they can prevail on their First Amendment facial challenge to the DATA's Pass-Through Prohibition.  And so, the Court must GRANT the Defendant's motion to dismiss Plaintiff's First Amendment claim set forth in Count IV of the amended complaint and DENY Plaintiffs' motion for summary judgment on this claim.

## V.      CONCLUSION

In sum, the DATA's Pass-Through Prohibition restricts protected speech, to the extent that this statute requires that a covered taxpayer not directly pass on the cost of the tax imposed by the DATA, "by means of a separate fee, surcharge, or line-item."  But Plaintiffs have not met their burden to show that a substantial number of the Pass-Through Prohibition's applications are unconstitutional, when judged in relation to the statute's plainly legitimate sweep, to prevail on their First Amendment claim.  And so, for the foregoing reasons, the Court:

> (1) **GRANTS** Defendant's motion to dismiss Count IV of the amended complaint;
>
> (2) **DENIES** Plaintiffs' motion for summary judgment as to Count IV of the amended complaint; and
>
> (3) **DISMISSES** this matter.

A separate Order shall issue.


**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby_____
LYDIA KAY GRIGGSBY
United States District Judge

20

JA087

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROOKE E. LIERMAN,<br><br>*Defendant.* | No. 1:21-cv-410-LKG |

**NOTICE OF APPEAL**

Plaintiffs Chamber of Commerce of the United States of America, NetChoice, and Computer & Communications Industry Association hereby appeal to the United States Court Appeals for the Fourth Circuit from the Memorandum Opinion and Order entered July 3, 2024 (Dkt. 119 & 120) granting Defendant's motion to dismiss Count IV of the amended complaint and ordering dismissal of this matter, and all other orders, rulings, and decisions merged therein.

Dated: August 2, 2024

Respectfully submitted,

*/s/ Michael B. Kimberly*

Michael B. Kimberly (No. 19086)
*McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
mkimberly@mwe.com
(202) 756-8000*

*Counsel for Plaintiffs*

1

JA088

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, I filed the forgoing Notice of Appeal electronically through the Court's CM/ECF filing system, and thereby served a copy on al parties of record.

/s/ *Michael B. Kimberly*
Michael B. Kimberly

JA089

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:21-cv-00410-LKG |
| v. | ) ) | Dated: August 8, 2024 |
| BROOKE LIERMAN, | ) ) | |
| Defendant. | ) ) ) | |

## **FINAL JUDGMENT**

On July 3, 2024 (ECF No. 120), the Court: (1) granted Defendant's motion to dismiss Count IV of the amended complaint; (2) denied Plaintiffs' motion for summary judgment as to Count IV of the amended complaint; and (3) dismissed this matter.

Pursuant to the Court's Order dated July 3, 2024, Count IV of plaintiffs' amended complaint is **DISMISSED**, and this matter is **DISMISSED**.

Final judgment shall be entered accordingly.

Each party to bear its own costs.

Dated:   08/08/2024                By:___

JA090

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs,*

v.

BROOKE E. LIERMAN,

*Defendant.*

No. 1:21-cv-410-LKG

---

**AMENDED NOTICE OF APPEAL**

Pursuant to Appellate Rules 3(c)(5) and 4(a)(2), notice is hereby given that plaintiffs Chamber of Commerce of the United States of America, NetChoice, and Computer & Communications Industry Association amend their August 2, 2024, notice of appeal (Dkt. 121)—which has been docketed in the U.S. Court of Appeals for the Fourth Circuit as No. 24-1727—to appeal from the separate final judgment entered on August 8, 2024 (Dkt. 124), together with all orders, rulings, or decisions merged therein, without limit.

Dated: August 13, 2024

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly (No. 19086)
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *mkimberly@mwe.com*
  *(202) 756-8000*

*Counsel for Plaintiffs*

JA091

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2024, I filed the forgoing Amended Notice of Appeal electronically through the Court's CM/ECF filing system, and thereby served a copy on all parties of record.

/s/ *Michael B. Kimberly*
Michael B. Kimberly

JA092

# Exhibit A

JA093

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:21-cv-00410-LKG |
| v. | ) ) | Dated: August 8, 2024 |
| BROOKE LIERMAN, | ) ) | |
| Defendant. | ) ) ) | |

## **FINAL JUDGMENT**

On July 3, 2024 (ECF No. 120), the Court: (1) granted Defendant's motion to dismiss Count IV of the amended complaint; (2) denied Plaintiffs' motion for summary judgment as to Count IV of the amended complaint; and (3) dismissed this matter.

Pursuant to the Court's Order dated July 3, 2024, Count IV of plaintiffs' amended complaint is **DISMISSED**, and this matter is **DISMISSED**.

Final judgment shall be entered accordingly.

Each party to bear its own costs.

Dated: _____08/08/2024_____          By:___



JA094