**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1727

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
NETCHOICE; COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION,

> Plaintiffs - Appellants,

> v.

BROOKE E. LIERMAN,

> Defendant - Appellee.

NATIONAL TAXPAYERS UNION FOUNDATION,

> Amicus Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Lydia Kay Griggsby, District Judge.  (1:21-cv-00410-LKG)

Argued:  May 6, 2025                    Decided:  August 15, 2025

Before RICHARDSON and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit
Judge.

Reversed and remanded by published opinion.  Judge Richardson wrote the opinion, in
which Judge Heytens and Judge Floyd joined.

**ARGUED:** Scott Allen Keller, LEHOTSKY KELLER COHN LLP, Washington, D.C., for Appellants. Ryan Robert Dietrich, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** Tara S. Morrissey, Jennifer B. Dickey, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Appellant Chamber of Commerce of the United States of America. Michael B. Kimberly, Charles Seidell, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Appellants. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. Tyler Martinez, NATIONAL TAXPAYERS UNION FOUNDATION, Washington, D.C., for Amicus Curiae.

_____

RICHARDSON, Circuit Judge:

In 1765, the British Parliament imposed a novel tax on the fledgling colonies in North America. The Stamp Act was reviled because it taxed most everything written on paper, from playing cards to newspapers. This not only cost people money but jeopardized their ability to speak on matters of public concern. John Adams roused Massachusetts against the tax, calling it an "enormous Engine . . . for battering down all the Rights and Liberties of America." 1 *The Adams Papers* 263 (L.H. Butterfield ed., 1961). Thousands of citizens protested when the dreaded stamps arrived in Charleston harbor, besieging the stamp officers in Fort Johnson for nine days. D.D. Wallace, *Constitutional History of South Carolina From 1725 To 1775* at 32–33 (1899). And across the colonies, outrage about the tax prompted the colonists to begin developing the arguments that would later form the Declaration of Independence. *See generally* Daniel Dulany, *Considerations on the Propriety of Imposing Taxes in the British Colonies* (1765). In more ways than one, the Stamp Act and other taxes like it ignited revolution.

Two and a half centuries later, the State of Maryland imposed another tax—not on those who print pamphlets but their internet-age successors. This tax applies to the money made by advertising on the internet. But as some things have changed, others have remained the same. It is no less true today than centuries ago that "the power to tax involves the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316, 431 (1819). And complaining about taxes remains a grand American political tradition.

Perhaps fearing such complaints, Maryland paired its tax with another rule. Companies that make money advertising on the internet must not only pay the tax but avoid

3

telling their customers how it affects pricing: No line items, no surcharges, no fees. If companies pass on the cost of the tax, they must do so in silence—keeping customers in the dark about why prices have gone up and thereby insulating Maryland from political responsibility.

That provision is the subject of this appeal. Plaintiffs, a group of trade associations, challenge Maryland's rule on grounds that it abridges their freedom to speak. They say Maryland has no reason, other than insulating themselves from criticism and political accountability, to forbid them to explain the tax to their customers. We agree. As much today as 250 years ago, criticizing the government—for taxes or anything else—is important discourse in a democratic society. The First Amendment forbids Maryland to suppress it.

## I.    BACKGROUND

### A.    Maryland's Digital Advertising Tax

Our world has changed radically since the late 18th century. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). Today, Americans work, study, worship, debate, and even fall in love on the internet. And as we do, we generate a staggering amount of data.

Worried that internet companies might "monetize" this "data for targeted advertising"—and so impose "negative externalities" on "the public"—the sponsor of Maryland's tax proposed a first-of-its-kind statute. *Digital Advertising Gross Revenues Tax – Exemption and Restriction: Testimony on S.B. 787 Before the H. Comm. on Ways & Means*, 2021 Leg., Reg. Sess. 1 (Md. 2021) (statement of Bill Ferguson, President, Md.

Senate).  Over a gubernatorial veto, Maryland's legislature enacted that statute, and Maryland thus became the first state in the country to tax the revenues companies produce by advertising on the internet.  *See* Young Ran (Christine) Kim & Darien Shanske, *State Digital Services Taxes*, 98 Notre Dame L. Rev. 741, 747 (2022).

The tax is unusual.  It applies only to companies in one sector.  It applies only to the biggest among them, those that generate at least $100 million in global annual gross revenues.  Md. Code, Tax-Gen. §§ 7.5-102, 7.5-103.  It taxes those "annual gross revenues" rather than net.  *Id.* § 7.5-101(c).  And its rate is neither constant across the board nor pegged to what companies do in Maryland; the more revenue a company makes, the higher the tax rate.  *Chamber of Com. of United States of Am. v. Lierman* (*Chamber of Commerce I*), 90 F.4th 679, 683 (4th Cir. 2024).

Soon after enacting the statute, Maryland amended it.  In response to complaints that companies subject to the tax might "simply pass the cost along to already struggling Maryland businesses, rather than absorb the cost of the tax," *Digital Advertising Tax – Exemption and Restriction:  Testimony on S.B. 787 Before the S. Comm. on Budget & Tax'n*, 2021 Leg., Reg. Sess. 1 (Md. 2021) (statement of Donald C. Fry, President & CEO, Greater Balt. Comm.), the legislature voted to adopt Senate Bill 787.  Relevant here, that bill added a subsection, which we call the pass-through provision, to the tax-imposing section.  That pass-through provision reads:  "A person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed

under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item." Md. Code, Tax-Gen. § 7.5-102(c).

**B.    Plaintiffs' Challenge**

The whole statute, as amended, quickly drew fire. Plaintiffs—a group of trade associations—sued Maryland's Comptroller of the Treasury before the tax even took effect. They advanced many theories,[1] but relevant here they claimed that the pass-through provision is a content-based restriction on political speech that violates the First Amendment because it forbids them to explain the tax to their customers and thus place political responsibility for price increases with Maryland. And as an alternative to that facial challenge, they added a second: that the provision unlawfully restricted commercial speech. The district court dismissed these First Amendment theories for lack of jurisdiction, reasoning that the Tax Injunction Act, 28 U.S.C. § 1341, forbade it to consider Plaintiffs' claim. *See generally Chamber of Com. of United States v. Franchot*, No. 21-cv-410-LKG, 2022 WL 17404768 (D. Md. 2022).

Plaintiffs appealed to this Court. We affirmed the district court's judgments on the non-First Amendment counts. But on the First Amendment claims, we concluded that the Tax Injunction Act did not apply. So we remanded the case for the district court to consider their merits. *See Chamber of Commerce I*, 90 F.4th at 687–89.

On remand, the district court agreed with Plaintiffs that the pass-through provision prohibited speech. In the district court's view, by forbidding companies to communicate

---

[1] That the tax was preempted, forbidden by the Commerce Clause, a due process violation, and so on.

about the tax "by means of a separate fee, surcharge, or line-item," the pass-through banned certain kinds of speech. *Chamber of Com. of United States v. Lierman*, 739 F. Supp. 3d 287, 300 (D. Md. 2024). But the district court nevertheless dismissed Plaintiffs' facial challenge, reasoning that the pass-through provision had many constitutional applications. *Id.* at 302.

Now, for the second time, Plaintiffs appeal.[2]

## II.    DISCUSSION

The First Amendment, together with the Fourteenth, provides that states "shall make no law . . . abridging the freedom of speech." Though many doctrines have grown from this unassuming phrase, all serve but one purpose. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Perhaps more than anything else, the First Amendment protects "the right to criticize the government." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 248 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part). States may make policy on contested issues. But they are not free to silence dissent. When a state chooses to address a controversial problem, it opens itself up to praise and blame in equal measure.

---

[2] We have jurisdiction under 28 U.S.C. § 1291. Because whether the pass-through burdens speech and withstands First Amendment scrutiny are questions of law, we answer them *de novo*. *Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 166 (4th Cir. 2025).

Yet as Plaintiffs tell it, Maryland has tried to take the sweet without the bitter. It has tackled an important political problem in a controversial way. That may well make for good policy. But just as the state is free to try it, those affected are free to complain. We readily agree with Plaintiffs' major premise: A state cannot duck criticism by silencing those affected by its tax. Our question is whether that is what Maryland has done here.

## A.      The Pass-Through Provision Regulates Protected Speech

To resolve this challenge to Maryland's statute, "we must first determine what it covers." *United States v. Hansen*, 599 U.S. 762, 770 (2023). Interpreting state statutes is ordinarily a task for state courts. *See Moshoures*, 131 F.4th at 162. But Maryland courts have not yet interpreted this one, so we must interpret it for ourselves. *See Chamber of Commerce I*, 90 F.4th at 684. As we do that—acknowledging that we stand in the shoes of Maryland's courts—"we look to the rules of construction applied by [Maryland's] highest court." *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am.*, 492 F.3d 484, 489 (4th Cir. 2007).

Maryland's "cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Williams v. Peninsula Reg'l Med. Ctr.*, 103 A.3d 658, 663 (Md. 2014) (quotation omitted). The state's courts first seek that intent in "the normal, plain meaning of the language of the statute." *Lockshin v. Semsker*, 987 A.2d 18, 28 (Md. 2010). If "the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends." *Id.* Yet in looking at text, Maryland courts do not do so "in a vacuum"—they also weigh the context in which it appears. *Id.* at 29. And if "the language" of a statute "is fairly susceptible of more than

one construction," Maryland courts "consider[] the facts of contemporary history, the prior state of the law, and the particular evil, abuse, or defect which the statute was designed to correct." *Elsberry v. Stanley Martin Cos.*, 286 A.3d 1, 13 (Md. 2022) (quotation omitted).

### 1. The pass-through provision forbids some, but not all, ways of speaking about the tax

As written, the pass-through provision does not forbid companies to pass on the cost of the digital advertising tax to their consumers. Indeed, it's hard to see how the law could do such a thing, short of freezing prices on the day the statute was enacted. Instead, the pass-through forbids companies only to directly pass on the cost "by" any of three specified "means": "separate fee[s], surcharge[s], or line-item[s]." Md. Code, Tax-Gen. § 7.5-102(c). In so doing, we conclude that the pass-through restricts the ways that a price increase can be *communicated*.

Like Maryland courts would, we start with the text. In common usage, each of the nouns listed in the pass-through—"fee," "surcharge," and "line-item"—describes a way of demanding money. A fee is "[a] charge or payment for labor or services." *Fee*, *Black's Law Dictionary* (12th ed. 2024). A surcharge is "[a]n additional . . . charge." *Surcharge*, *Black's Law Dictionary*. And although "line-item" can mean different things in different contexts, in this context it is one way to describe a charge: "a single entry or notation to which a particular dollar amount is attached." *Item*, *Black's Law Dictionary*; *see* Antonin Scalia & Bryan A. Garner, *Reading Law* 195 (2012) (*noscitur a sociis*). Each of these aims to induce payment. But none does unless the person who's supposed to pay *knows* he's supposed to pay. Imposing a fee or surcharge is thus a communicative act. It is a

"demand," written or spoken. *Charge*, Black's Law Dictionary. And each of the statutory terms describes one form that such a demand can take.

Because fees and surcharges communicate demands for payment, the most natural place to see one is on an invoice or bill. Maryland law often uses the term "surcharge" to describe extra costs noted on bills—sometimes even requiring billers to disclose components of prices by listing them as surcharges. *See, e.g.*, Md. Code, Pub. Util. § 7-222(d)(2). So too with fees. *See, e.g.*, Md. Code, Env't § 4-202.1(h)(1). These laws confirm that "surcharge" and "fee" are usually ways to split total costs into their parts—and to then tell customers about them.

Closely related to invoices (and confirming much the same point) another natural place to see a surcharge or fee is in an advertisement or notice that proposes a sale. This dynamic has generated a great deal of legislation and litigation. *See, e.g.*, N.Y. Gen. Bus. Law § 518 (McKinney); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017); *see also* Va. Code § 59.1-608. As these common uses illustrate, surcharges and fees are generally ways of communicating something. They tell customers what they're paying for—and how much.

To be sure, surcharges and fees are not always communicated to customers. This was Maryland's lead argument in the last appeal. Its theory was that the terms fee, surcharge, and line item could describe mere accounting measures. Put another way, these words might describe numbers calculated internally but never communicated to the customer except as part of one undifferentiated "amount due." We agree—to a point. Just take the concept of hidden fees. That a bill shows just one total price hardly means that no

10

fees lurk behind the one-number wrapper. *See, e.g.*, Cal. Civ. Code § 1770(a)(29)(A) (requiring disclosure of fees); Minn. Stat. § 325G.051(a) (requiring disclosure of surcharges). Or consider that, in ordinary usage, a "line item" could just as well appear on a budget as a bill. In a vacuum, we might accept that "fee, surcharge, or line-item" can refer to figures that a company calculates yet never communicates.

But two key pieces of context rule out that interpretation in this case.

First, the pass-through provision doesn't say "fee, surcharge, or line-item" generally; it says "*separate* fee, surcharge, or line-item." Md. Code, Tax-Gen. § 7.5-102(c) (emphasis added). And if the cost of the tax figures into the bill only as a hidden part of the total due, that cost isn't "pass[ed] on by means of" anything "separate." It might be separate in the company's QuickBooks, but that separation is not the "means" by which the cost is passed. To "pass[] on" the cost by some "separate" "means," a company would have to separate the cost on the bill that does the passing.

And second, the pass-through provision *allows* companies to "directly pass on the cost of the tax." If it did not, then the phrase that follows—"by means of a separate fee, surcharge, or line-item"—would do no work. Yet "these words cannot be meaningless, else they would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936). Like the Supreme Court, Maryland courts read statutes "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Wheeling v. Selene Fin. LP*, 250 A.3d 197, 209 (Md. 2021). Doing that, we read the pass-through to forbid only some means—the communicative ones—and permit the others.

11

It's not hard to see what the other means are.  To directly pass on the cost, the merchant must simply require the customer to pay money equal to the tax liability resulting from the transaction.  A company need not tell the customer how much money that is, or even that the tax exists.  All it has to do is make sure that, somehow, the cost of the tax makes its way into the total amount the customer is asked to pay.  By adding the cost without telling the customer about it, a company "directly pass[es] on the cost of the tax" but *not* "by means of a separate fee, surcharge, or line-item."

With these considerations in mind, we think the pass-through is best read to forbid only three "means" of passing on the cost of the tax.  Each of these means is a way of speaking to customers about the price.  And so the upshot of the pass-through is that companies may pass on the tax by increasing their prices or silently adding the cost of the tax to the total due on an invoice.  But they may not pass on the tax by noting a separate cost on the bill.[3]

---

[3] Maryland objects that although hiding the tax in one aggregated total might "pass[] on the cost," it wouldn't do so "directly."  Response Br. 15–16.  In Maryland's telling, "there is no way to directly pass on a tax without having communicated the tax as a charge or as a notation to which a particular dollar amount is attached."  *Id.* at 16 (cleaned up).  And if that's right, the theory goes, then the pass-through provision does not prohibit complaining about the tax.

We are unconvinced.  For one, it's far from obvious that this is what "directly" means.  To do something "directly" is to do it "[w]ithout the intervention of a medium or agent."  *Directly*, Oxford English Dictionary dfn. 5 (online ed. 2024).  To pass a cost directly to a customer, then, a company must take the funds right from the customer.  By contrast, a company could instead pass the cost indirectly by billing the tax to someone else—say, the customer's supplier.  Economically, the result may well be the same:  The customer ultimately pays for the tax.  But by introducing a third party, the passing becomes indirect.  Yet there are no third parties here—just bills from sellers to buyers. (Continued)

The pass-through thus restricts how companies can talk about the tax—and in so doing, it regulates speech. Telling customers what they must pay is speech. *Expressions Hair Design*, 581 U.S. at 47. To regulate how companies can communicate that information—allowing some ways and forbidding others—is thus to regulate speech. *Id.*; *see also BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008).

Indeed, Maryland all but agrees that its law regulates speech. Under the pass-through, it now stipulates, the difference between lawful conduct and unlawful is what language appears on invoices. The provision "does not prohibit a person" from "factoring [the cost of the tax] into its customer pricing." J.A. 45; *see also id.* at 50. Companies can set whatever prices they want. The provision "does not affect an entity's internal-facing . . . accounting regarding the amount to charge" either. J.A. 50. Companies can calculate their prices however they want. The pass-through lies dormant until they begin to speak. And even when they speak, the law "places no limitations or constraints on what the taxpayer can communicate about the tax, whether it be stating the amount of digital ad tax

---

To be sure, "directly" has other senses. In other contexts, it may indeed mean something like *transparent* or *without misdirection*. But when used to modify the phrase "passing on," this sense is the wrong one. Suppose you asked your brother, "please pass the gravy directly to me." Then he handed it first to your sister, who in turn handed it to you. By routing the gravy boat through a third party, your brother passed it to you *indirectly*. By contrast, suppose that he instead poured the gravy into a coffee mug and then handed it right to you. You might think he did something strange. But he didn't pass the gravy "indirectly" just because of the oddness.

And even if Maryland had the better of this semantic battle, its reading would still create plenty of surplusage. If passing on directly *can't be done* without a "separate fee, surcharge, or line-item," why bother enumerating those words in the statute? Why stress that particular "means" are forbidden? We do not think Maryland courts would read the statute this way.

or expressing any views the taxpayer might have about the tax." J.A. 52. Save for one. Companies cannot "communicate to customers . . . through a 'separate fee, surcharge, or line-item." Response Br. 10 (quoting § 7.5-102(c)).[4] Although neither Maryland nor anyone else may stipulate to legal conclusions, *see Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024), in the context of the First Amendment, we may "rely on the State's plausible interpretation of the law it is charged with enforcing." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011). And Maryland's concessions are telling.

## 2.    The pass-through provision does not regulate conduct

Now all but conceding that its law affects speech, Maryland shifts gears. It claims that more than anything, the pass-through provision aims at conduct. The point of the provision, it says, is to regulate the way transactions are structured—not the way companies talk about them. So even if it regulates speech, the story goes, the burden is only incidental. *Cf. Hansen*, 599 U.S. at 783 (citation omitted).

But we struggle to see what transactional structures the pass-through forbids. As explained, the pass-through allows companies to pass on the cost of the tax. If it forbade passing on the cost, then the "by means of" proviso—and the words that follow it—would be surplusage. And Maryland's concessions confirm as much. As the State now says, companies can calculate how much tax they'll owe because of a given transaction and add that very amount to the customer's bill. Economically, this puts the whole cost of the tax

---

[4] Maryland doubled down on this concession at argument. Companies can drop a footnote on an invoice noting the exact price increase attributable to the tax; they can even include a cover sheet with each invoice complaining about the tax.

on the customer's ledger.  And whatever else Maryland can do, it cannot ban speech to support a conduct ban that does not exist.

Resisting this conclusion, Maryland points us toward the Sixth Circuit's decision in a similar case, *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008).  In that case, Kentucky enacted a tax on telecommunications companies that forbade them to do either of *two* things:  No "collecting the tax directly from consumers," and no "separately stating the tax on the bill."  *Id.* at 500 (cleaned up).  As Maryland points out, the Sixth Circuit held that the no-collecting provision banned "non-expressive conduct, not speech." *Id.* at 510.

But this gets Maryland nowhere.  Maryland's pass-through provision has one prong, not two.  And the prong it has allows collecting the tax directly from consumers.  The pass-through provision instead resembles the *second* prong of the *BellSouth* statute—the prong forbidding companies to "separately state the tax on the bill."  *Id.* at 506 (cleaned up).  Yet as the *BellSouth* court rightly held, that provision "regulates speech, not conduct."  *Id.*

Trying another tack, Maryland asserts that even if its law does not prevent companies from shifting the economic burden of the tax, it does prevent them from shifting the *legal* burden of the tax—its "legal incidence."  Response Br. 14.  But the *BellSouth* court aptly explained why this argument is confused.  To "switch the legal incidence of taxation" is to "say[] to customers, 'This is your legal responsibility, not ours.'"  *Id.* at 503. But who is responsible for paying a tax is up to the state.  *See id.* at 509; *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 460 (1995).  The state decides who shall be "the taxpayer"—who is "liable to pay the . . . tax"—and thus to be sued should the tax go

unpaid.  *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 103–05 (2005); *see also Gurley v. Rhoden*, 421 U.S. 200, 204 (1975) (distinguishing legal and economic incidence on this ground).[5]

And as in *BellSouth*, this statute "contains ample, indeed undeniable, evidence that the [companies] bear the legal burden of the tax."  542 F.3d at 503.  By taxing "gross revenues" rather than a percentage of each sale, *see* § 7.5-102(a), and by pegging the rate to the amount of a taxpayer's gross revenues, *see* § 7.5-103, and by requiring only "person[s]" who have "revenues derived from digital advertising services" to "file . . . return[s]," § 7.5-201(a), and by specifically requiring those very same "person[s]" to "pay the . . . tax," § 7.5-301(a), the statute makes clear that customers are not legally responsible for the tax.  If a company invoices a customer for the cost of a tax, and the customer does not pay, that may be breach of contract.  But we have no reason to think that under Maryland law, merely invoicing someone transfers a taxpayer's liability to the state to another party.

Without giving the customer a duty to pay the state, all an invoice could do is give the customer a duty to pay the company.  And that conduct, Maryland agrees, is lawful.  Yet if companies can do that, there is no conduct left to regulate.  So the pass-through provision regulates only speech.

---

[5] As *Gurley* acknowledged, passing on the cost of a tax may suffice to shift the legal incidence if the law "require[s]" a merchant "to pass the tax on to the purchaser-consumer." 421 U.S. at 204–05; *see also Comptroller of the Treasury v. World Inns, Inc.*, 528 A.2d 477, 480–81 (Md. 1987).  But of course, Maryland's law does nothing of the sort.

16

**B.     The Pass-Through Provision Does Not Withstand Heightened Scrutiny**

Maryland's law does not just regulate speech.  It also distinguishes lawful speech from unlawful based on what it says.  It is thus content based and presumptively unlawful.  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).  Ordinarily, this would mean that Maryland can enforce the pass-through only if it could meet the "burden" of strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (quoting *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

But understandably, Maryland would rather not tangle with "the most demanding test known to constitutional law." *Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) (quotation omitted).  So the state counters that even if the pass-through provision regulates speech—and not just as a way to get at conduct—it should be spared the burden of strict scrutiny because the speech it regulates concerns commerce.

Until a half-century ago, commercial speech received no First Amendment protection at all.  *Contrast Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942) (no protection), *with Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (yes protection).  But today, if a state wishes to impose a "content-based burden" on commercial speech, it in turn assumes the "burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571–72.  And to do that, though the state need not survive strict scrutiny, it does have to overcome intermediate scrutiny.  The state must show that its law "directly advances" a "substantial" government

17

interest and imposes a burden "no[] more extensive than is necessary." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

We doubt that Maryland only needs to satisfy this less-demanding standard. An invoice that calls attention to Maryland for its tax does not obviously "propos[e] a commercial transaction" or "relate[] solely to . . . economic interests." *Maryland Shall Issue, Inc. v. Anne Arundel County*, 91 F.4th 238, 248 (4th Cir. 2024) (cleaned up) (first quoting *Zauderer v. Office of Disciplinary Couns of Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985); then quoting *Central Hudson*, 447 U.S. at 561). On the contrary, complaining about taxes is among the oldest American political traditions. To name just one example, the most famous piece of political speech in our history declared that George III of England was "imposing Taxes on us without our Consent." *Declaration of Independence* para. 19 (1776). And even setting aside the political valence of speech about taxes, Maryland's law is a "blanket prohibition against truthful, nonmisleading speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (plurality opinion).

But we need not decide whether the speech Maryland proposes to ban is political or commercial, because the pass-through provision fails even intermediate scrutiny. Maryland's sole interest in banning this speech, it says, is banning the conduct that comes with it. That is, Maryland wants to be sure that companies bear economic and legal

18

responsibility for the tax.[6]  And its chosen means is a speech ban:  Invoices may not contain separate fees, surcharges, or line items.

Even if Maryland's stated interest is important, we do not see how Maryland serves it by prohibiting these "means" of passing the cost yet not other "means" of passing the cost.  As far as economic responsibility goes, what "means" a company uses makes no difference.  Passing the cost of the tax is passing the cost of the tax.  Whether a company does it by raising prices or adding fees, the result is the same:  Consumers pay.  So by conceding that the law does nothing to prevent raising prices, Maryland gives away the game.  And Maryland fares no better when it comes to legal responsibility for the tax.  The tax statute makes clear that advertisers, not their customers, are responsible for computing the amount owed, filing returns, and remitting payment.  A sales contract that includes some money to be spent on the tax—even the exact amount to be spent on the tax—simply does not transfer these responsibilities.  With respect to both these kinds of responsibility for the tax, the pass-through provision is not just "wildly underinclusive," *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 802 (2011), it is *totally* underinclusive.

This "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Id.*  But the doubt does not last long.  Though the pass-through "makes no rational sense if the Government's true aim is to suppress" economic or legal responsibility-shifting, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995), it makes

---

[6] At argument, the state both confirmed that this is its only interest and disclaimed any preference to remand the case so it can identify more interests or find more facts to support it.

plenty of sense if Maryland's true aim is to prevent companies from identifying who is *politically* accountable for the tax. Faced with rising prices, consumers will want to know: "Why have prices been raised?" *BellSouth*, 542 F.3d at 509. Yet the pass-through "prevents [companies] from describing the tax in the one setting where the consumer is guaranteed to look: the invoice." *Id.* at 509–10. No doubt, Maryland has prudential reasons not to want the question answered. But as all we have said so far should make clear, keeping out of hot water with voters is not among the interests that can justify a speech ban.

"The foregoing discussion also makes clear why a facial challenge is appropriate." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). If Maryland's asserted interest cannot justify its choice to ban even one utterance based on its content, we have no trouble concluding that it cannot stand. Without any connection to the interest Maryland invokes, the pass-through provision has no plainly legitimate sweep; it has no constitutional applications. For its "lack of tailoring" to the state's claimed goals is "present in every case." *Id.* We therefore hold that the pass-through provision is facially unconstitutional.

Before we close, we also note that the district court's contrary conclusion rested on at least two conceptual mistakes. First, the district court reasoned that "because the State of Maryland unquestionably possesses the power to levy taxes," the statute imposing the digital advertising tax "has a plainly legitimate sweep." *Chamber of Commerce*, 739 F. Supp. 3d at 302. This is true but irrelevant. The question is not whether the whole statute has constitutional applications but whether the pass-through provision does. Plaintiffs *may* direct facial challenges at whole statutes, but that does not mean they must. *See Moody*,

603 U.S. at 723.  Under our precedent, plaintiffs don't even have to challenge an entire statutory act; they can train their fire on just one offending word.  *See United States v. Miselis*, 972 F.3d 518, 542–43 (4th Cir. 2020).  Any other rule would allow a legislature to preemptively fend off any facial challenge that someone might bring by burying the offending provision in an omnibus spending bill that has millions of constitutional applications.  Just consider this case.  Under the district court's approach, because states have the power to levy taxes, they can avoid a facial challenge by strapping onto any tax bill a rule that says "No Criticizing Republicans."  It should go without saying that this is not how our First Amendment doctrine works.

Second, the district court claimed that the pass-through provision has "many" constitutional "applications" because it "does not prohibit a taxpayer from expressing its views or opinions about the tax imposed" or telling customers that price hikes are due to the tax.  *Chamber of Commerce*, 739 F. Supp. 3d at 302.  We agree that the pass-through prevents neither of these kinds of speech, at least so long as they do not take the form of fees, surcharges, or line items.  But that just means these kinds of speech are not "applications" of the pass-through—any more than a statute that forbids setting off fireworks in a park forbids someone to walk his dog there.  So these give us no reason at all to think that the pass-through provision has constitutional applications.

\*

The pass-through provision of Maryland's digital advertising tax is unconstitutional in all of its applications.  But reaching that conclusion does not quite end this case.  For federal courts do not answer legal questions in the abstract; they grant remedies.  *Haaland*

21

*v. Brackeen*, 599 U.S. 255, 294 (2023).  And the question remains what remedy Plaintiffs should get.

In the past, some courts would award successful facial challengers universal injunctions that forbade a defendant to enforce the challenged law against anyone—party or not.  That is what Plaintiffs sought below.  *See* J.A. 36 ("Plaintiffs respectfully request that the Court . . . permanently enjoin Defendant . . . from taking any action to enforce the Act insofar as it . . . forbids the inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge.").

But "the universal injunction . . . falls outside the bounds of a federal court's equitable authority."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 (2025).  At least without special statutory authorization, the federal courts have no power to impose them.  They must instead tailor equitable relief "to each plaintiff."  *Id.* at 2563.  Yet Plaintiffs here are associations with many members.  And this makes it hard to tell how far an injunction can sweep to give Plaintiffs "complete relief."  *Id.* at 2557–58.  Moreover, setting aside how far an injunction *can* legitimately sweep, an injunction is never awarded as of right.  *See id.* at 2558; *Hecht Co. v. Bowles*, 321 U.S. 321, 328–29 (1944).  To determine whether one *should* issue and how far it *should* sweep, a court must carefully weigh the equities.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392–93 (2006).

These complex questions, we think, should be answered by the district court in the first instance.  So we will remand the case to the district court with instructions to consider what remedy is appropriate in light of our decision.

22

*          *          *

The states are free to make controversial policy.  That is part of our federalist bargain.  *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  But with that freedom comes constraint.  States may not forbid regulated parties to talk about their regulations unless they withstand First Amendment scrutiny.  Maryland's pass-through provision does not.

*REVERSED AND REMANDED.*